MATTHEW PRUSECKI, PETITIONER-RESPONDENT, v. BRANCH MOTOR EXPRESS, RESPONDENT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued November 7, 1985—Decided December 3, 1985.

Before Judges O'BRIEN, SIMPSON and SCALERA.

*Sheldon Schiffman* argued the cause for appellant (*Dwyer, Connell & Lisbona,* attorneys, *Sheldon Schiffman,* of counsel and on the brief).

*Jack Mandell* argued the cause for respondent (*Balk, Balk and Mandell,* P.A. attorneys, *Jack Mandell,* on the brief).

The opinion of the court was delivered by

SCALERA, J.S.C. (temporarily assigned).

The employer appeals from a judgment entered in the Division of Workers' Compensation that determined the petitioner to be 25% partially permanently disabled, 20% as a result of a myocardial infarction, and 5% for traumatic anxiety and cardiophobia. We address here the recent statutory amendment relating to coronary and cardiovascular injuries and more particularly the so-called "wear and tear" requirement contained in the statute.

The evidence produced at the hearing established that petitioner was 53 years old and had worked at Branch Motor Express for 30 years. In October 1981 he operated a hi-lo forklift machine as a platform man, loading and unloading trucks. On October 28, 1981 he worked the midnight to 9 a.m. shift as he had done for ten or fifteen years. He arrived at work just before midnight feeling fine. When he started his shift, he was told by his foreman to quickly unload specific cargo in the trailer assigned to him. That freight (tools) was in the front of the trailer, farthest from the doors, and had to be carried by him over the boxes and crates in the middle of the trailer. Access to the boxes in the front of the trailer was blocked by a seven-foot by ten-foot crate that could be moved only by using a crane, after removing the canvas trailer roof.

The trailer was 40 or 45 feet long and was full. Prusecki asked the foreman for a helper at the beginning of the shift and several other times during the shift "because of the way the truck was loaded"; he had to maneuver the boxes by hand, which ranged in weight from very light to about 200 pounds, over the freight in his way instead of using his hi-lo machine in the usual manner. He received no help until near the end of his shift and they did not help him with the difficult task of maneuvering boxes to the rear of the trailer to be unloaded; rather, they waited for him to get the boxes to the rear of the trailer, where they placed the boxes on their carts and wheeled

them away.  He manually unloaded 20 to 25 boxes during his shift.

Shortly before his "dinner" break at 6 a.m. Prusecki began sweating heavily.  He took his dinner break from 6 to 7 a.m. and ate some of the soup and a sandwich which he had brought. He felt sick and lay down for a half-hour during his break.  At that time, he was sweating heavily and his heart was pounding. He began to feel pain in his elbows, his heart continued to pound and he felt dizzy.  Nonetheless, he resumed working at 7 a.m. and was joined by a co-worker, Satnowski, who began to push petitioner playfully.  Prusecki asked him to stop because he had gas pains and felt sick.  Satnowski offered to do the heavy work, and directed Prusecki to use a cart to perform the less strenuous task of carting the boxes away, but the symptoms persisted.

They worked until about 8:45 a.m. and then went to the locker room to wash up.  Prusecki began turning grey and told Satnowski that his chest and left arm hurt.  Also his speech was "getting funny."  Satnowski and another co-worker drove Prusecki to the emergency room at St. James Hospital in Newark where he was admitted and stayed in the hospital until November 10.

Prusecki said that he had had no prior problem with his heart.  Rush jobs, like the one on which he was working when his heart attack occurred, were fairly common; on occasion he had been required to climb over boxes to get at items, as he was doing on the day of his attack.  He admitted to smoking between a pack and a pack and a half of cigarettes per day at the time.  In mid-February 1982 he returned to the same job as he had although now he works slower and is given lighter cargo to load and unload.

He no longer mows his lawn or does much of the work around the house, such as home improvements, and his sex life has suffered.  He fears having another heart attack and he does not go out as much or stay out as late.

Hubert Silberner, M.D., testified as an expert for petitioner and opined that Prusecki "suffered an acute myocardial infarction on October 28, 1981 during the course of his employment at Branch Motors Express." He gave as reasons for this conclusion:

He was admitted to the hospital and kept in the intensive care unit for the investigation. During the course of the investigation, he was noted to have elevation of the cardiac enzymes. That is the SPK, the SGOT and the LDH. The changes of the electrocardiogram were not marked. It was necessary to take a special procedure to move the electrodes into a higher location at which time they found evidence of Q waves. He stayed in the hospital for a period of approximately two weeks and subsequent investigation in the form of a coronary angiography confirmed that he did have coronary arteries disease. There were certain pre-existing factors that should be mentioned here. He was a heavy cigarette smoker. He had high blood pressure. He had diabetes, and there was a family history. His father died at an early age and also his uncle. So, considering all these factors, an individual with multiple risk factors, doing heavy employment, subsequently found to have organic disease of the coronary arteries, develops severe chest pain associated with palpitation, rapid heart beat and sweating, with elevation of all three cardiac enzymes, it is my opinion that he suffered an acute myocardial infarction. It is my opinion that the location of the infarct was away from the usual anatomical location, so that the routine electrocardiography at the time of his hospitalization did not show much in the way of change, did not show anything in the way of changes.

Likewise, subsequent electrocardiography performed in my office showed a normal cardiogram. However, cardiac enzymes are very sensitive tests, and in view of the fact that he had significant elevation of the CPK plus the history plus the subsequent demonstration of organic coronary artery disease, it is in my opinion that he suffered a myocardial infarction in the course of the employment on October 28, 1981.

The doctor thought that the strongest indication that Prusecki had a heart attack was the 787 CPK reading taken at St. James shortly after his admission. A CPK reading of greater than 225 indicates that there has been muscle damage somewhere in the body, causing a release of the enzyme that produces the reading. Prusecki's elevated CPK reading indicated that there had been heart damage.

Dr. Silberner noted further that on November 30, 1981 Prusecki went to Beth Israel Hospital in Newark where he underwent cardiac catheterization. He said that the test showed a 60 to 80% "occlusion of the left circumflex artery" and a 70%

"occlusion of the middle right coronary artery." He concluded that Prusecki's cardiac disability was 40% of partial total because he now suffered from weakness, easy fatigue and could not do as much as before the heart attack.

William Burke, M.D., was the respondent's expert. He had examined Prusecki in March 1982 and testified that petitioner's heart appeared normal. The pulmonary function studies and blood count were both normal; the treadmill test gave no indication of "myocardial ischemia," although Prusecki had to quit the treadmill test before it was finished because of fatigue and shortness of breath. Burke reviewed the results of a pyrophosphates scan and concluded that it was normal. He conceded that minimal amounts of damage to the heart as would result from a mild heart attack, might not be detectable using a pyrophosphates scan. Burke concluded that Prusecki had suffered no myocardial infarction. However, he conceded that he "may have had a mild or slight myocardial infarction" which may "possibly" have resulted from his work effort.

The trial judge found that Prusecki had had a heart attack while working and that the work effort was "too great for his system at the time." He acknowledged that the EKG taken upon Prusecki's arrival at St. James did not indicate a heart attack but concluded that that was not dispositive. He said

I am satisfied that his serum levels were elevated. This is not an exact science. They ascertain even simple elevations reflect certain things, [sic], but they are not totally specific as far as an infarction is concerned. But, when you put together several tests and the history that was given, the fact that he subsequently underwent catheterization, which indicated his condition was advanced as far as heart disease is concerned, the law provides that you take the worker as you find him—and I had no way of estimating any pre-existing condition. It was not to my knowledge fixed or arrested or measurable, and the man is stricken in his already weakened state, and I think that the law was not changed in that fact, that this is the type of individual who, after proving his case, is entitled to these benefits.

Compensability here is governed by *N.J.S.A.* 34:15–7.2; *L.* 1979, *c.* 283, § 3 which states,

In any claim for compensation for injury or death from cardiovascular or cerebral vascular causes, the claimant shall prove by a preponderance of the

credible evidence that the injury or death was produced by the work effort or strain involving a substantial condition, event or happening in excess of the wear and tear of the claimant's daily living and in reasonable medical probability caused in a material degree the cardiovascular or cerebral vascular injury or death resulting therefrom.

Material degree means an appreciable degree or a degree substantially greater than de minimis.

This section was one part of a 1979 legislative effort to reform our Workers' Compensation Act. Recently, this court had occasion to review the history and purposes of this amendatory legislation. We noted there that the legislative history signified an intent to "put significantly more money into the hands of the more seriously injured workers" while it would benefit employers in requiring that petitioners seeking compensation for cardiovascular injuries meet a higher burden of proof than imposed under the previous applicable case law. *Perno v. Orstein Fashions, Inc.*, 196 *N.J.Super.* 174 (App.Div.1984).

The employer here urges vacation of the award to petitioner. It asserts that he failed to produce sufficient proofs from which the trial judge could conclude properly and reasonably that, (1) the petitioner had suffered a cardiovascular injury as a result of work effort or strain, (2) that the cardiovascular injury claimed was job-related in a material degree and (3) that the injury was caused by a substantial work effort which was "in excess of the wear and tear of the petitioner's daily living." In other words, the employer has cited each of the legal criteria set forth in the statute and challenged the sufficiency of the proofs below as applied to each of those requirements. It also attacks the propriety of the trial judge's conclusions based on those proofs. *Close v. Kordulak Bros.*, 44 *N.J.* 589 (1965).

Petitioner responds by directing our attention to the limited nature of our review. *Ibid; State v. Johnson*, 42 *N.J.* 146, 162 (1964). He further asserts that a review of the evidence produced below and the opinion of the trial judge will demonstrate an awareness of the elements of the legislation and a deliberate and proper judgment in accordance with that mandate.

We have examined carefully the record to determine if the resulting award reasonably could have been reached on sufficient or credible evidence and whether the trial judge made findings of fact which were sufficiently clear and complete to permit review. *Kordulak Bros., supra, Perez v. Pantasote, Inc.,* 95 *N.J.* 105, 118–120 (1984).

We first conclude that there was sufficient evidence to substantiate the findings and conclusions that the petitioner had suffered a cardiovascular injury as a result of a "work effort or strain involving a substantial condition, event or happening" which "in reasonable medical probability caused in a material degree the cardiovascular ... injury...." *N.J.S.A.* 34:15–7.2. However, we express our concern with the lack of evidence as it relates to the remainder of the statutory language which requires that the "work effort or strain" which produced that injury be *"in excess of the wear and tear of the claimant's daily living."* In *Perno,* we did not address this issue.

The only evidence produced at trial which touched on petitioner's "daily living," aside from work related activities, was elicited from him as follows:

Q  Has your home life been affected at all since this happened?

A  Oh, yeah, my sex life has.

Q  How has it?  Can you explain a little bit?

A  Well, a lot of times if ... my heart starts beating bad, I got to stop.

Q  How else, if at all, does it affect your home life?

A  Well, I don't mow the lawn no more or nothing.  My kids do that.

Q  Are there other things that you can't or won't do?  A  Yeah, like I used to—I want to panel or something, I can't.  I got to let one of the kids do it, and I supervise the job.

Q  Like doing what?

A  Panel, paneling up in the room or putting up a block ceiling or something like that, I don't do that at home no more.

Q  Is there anything else?

A  Not that I can think of.

At oral argument petitioner's attorney conceded that there was no proof to show what constituted his "daily living" and that such failure was "the weakness in petitioner's case."

As pointed out in *Perno, supra,* 196 *N.J.Super.* at 180–183, the original amendatory legislation underwent changes directed primarily at redefining the work effort necessary to produce a compensable coronary event. That was settled by incorporation of the present language requiring a "substantial event or happening" which causes the injury or death in a "material degree." But an additional requirement was imposed for one to achieve a level of compensability. Now it is required that a claimant "shall prove" that the substantial work effort or strain is "in excess of the wear and tear of the claimant's daily living." Thus, whatever other proof requirements were mandated, it is clear that the legislature established this norm or standard against which to compare the triggering work event. A "wear and tear" rule requirement is not novel in the area of workers' compensation. *See* 1B *Larson, Workmens' Compensation Law,* § 38.64(a)(7) at 7–188, 7–193–194 (1985), where the author comments that, "This test appears to be essentially aimed at distinguishing between heart attacks that are the result of the 'natural progression' of heart disease, and those that are not, . . . ." It has been observed that the existence of this test in the statute raises ". . . a question in each case as to whether the . . . job activity itself entails greater exertion than the ordinary wear and tear of life (citation omitted) and this question is factual." *Lerner v. Terrycab Company,* 20 *A.D.*2d 615, 245 *N.Y.S.*2d 565, 567 (App.Div.1963). Unfortunately, the cases that have dealt with this comparison do not define specifically what proof is necessary to comply with the statutorily required standards. (It should be noted that our statute requires a subjective comparison of the "wear and tear of the *claimant's* daily living" as opposed to a more generalized or objective standard such as "the ordinary wear and tear of life." 1B *Larson, supra,* § 38.64 at 7–188.

Much can be argued concerning the intent of the legislature in amending the provisions of the statute by reference to legislative history. *Perno, supra,* 196 *N.J.Super.* 174. While that research is helpful, "In the final analysis it is the statute

as written that must govern." *Pantasote, Inc., supra,* 95 *N.J.* at 114.

It is true that the trial judge here did demonstrate an awareness of this issue when he said in the course of his opinion,

> That is, that the work that he was doing was over and above the ordinary wear and tear of his day to day life; not only at work, but also in his private life. There is no indication that on a daily basis or in his lifetime that his outside activities bore any relationship to the type of loading or unloading, rather in this instance, that Mr. Prusecki was doing in the early morning hours as he testified.

A review of the record reveals this to be a naked conclusion simply rendered in the language of the statute without adequate evidence to support it. *Close v. Kordulak Bros.,* 44 *N.J.* 589 (1965). There was a paucity of proof introduced below to indicate what activities might have constituted "claimant's daily living" and that was offered only incidentally to show the impact of the coronary on his subsequent work and living habits. The trial court did not have any evidence before it from which to draw conclusions and make the required statutory comparison in this regard. There was testimony concerning claimant's daily activities at work, but obviously he engaged in other activities as part of his daily living aside from work. It is not speculative to conclude that he might have been engaged regularly in avocations or hobbies that required exertions which alone might have triggered the coronary injury or, he might have led a quiet, non-strenuous, sedentary existence outside of his work life. We are not attempting to suggest any prejudgments for it is the function of the judge of compensation to assess those proofs and to make the determination after weighing them and comparing them to the statutory elements.

The employer urges that the wear and tear of this petitioner's daily living requires a consideration of the effects of his daily *work* activities including the work activities in question. It observes correctly that one's daily life is a composite of all of one's activities. It becomes obvious that such a simplistic approach would render virtually any coronary injury or death

non-compensable and would impose again the "unusual strain" doctrine of the past enunciated in *Seiken v. Todd Dry Dock, Inc.*, 2 *N.J.* 469 (1949), overruled in *Ciuba v. Irvington Varnish & Insulator Co.*, 27 *N.J.* 127, 138 (1958). Yet, eliminating entirely *any* consideration of a claimant's daily work activities in assessing his daily living would ignore the clear legislative intent and signal a return to the "ordinary work effort" standard of *Dwyer v. Ford Motor Co.*, 36 *N.J.* 487 (1962); *Perno, supra,* 196 *N.J.Super.* 174.

In our judgment the addition of the "wear and tear" requirement requires a hybrid approach which will steer a course between the two doctrines of the past. A claimant must prove that a work event or strain was so substantial that it materially caused the injury or death *and* that such triggering event, when compared with the rigors caused by the stresses and strains *ordinarily and regularly* encountered in the work place and at home, leads to the conclusion that the injury or death occurred notwithstanding those daily recurring experiences. Obviously, these forces may be physical, psychological or emotional. *McClain v. Woodbury Bd. of Educ.*, 30 *N.J.* 567, 571 (1959). But only after evidence is produced can such facts be determined and the necessary comparison made. Thus, if it appears by a preponderance of the evidence that such work event caused the injury or death notwithstanding the effects of such daily living, the injury or death becomes compensable. *Cf. McClain, supra,* 30 *N.J.* at 574–587 (Price, S.J.A.D, dissenting). The clear legislative mandate requires that the claimant produce such proofs as may be necessary to permit adequate and reasonable findings to make that determination and also to facilitate our function in reviewing such determinations. *Pantasote, Inc., supra,* 95 *N.J.* at 118, 120.

In our view, the claimant here failed to sustain that burden of proof with respect to the wear and tear of his daily living. Respondent urges that we enter judgment for the employer-respondent because of that failure. Since this opinion appears to

represent the first authoritative comment concerning this aspect of the law, we think the interest of justice would be served better if we were to allow petitioner an opportunity to meet that burden.

Accordingly, we remand this matter to the Division of Workers' Compensation for further proceedings not inconsistent herewith, at which time the parties will have the opportunity to fully litigate this issue. *Gilligan v. International Paper Co.*, 24 *N.J.* 230, 239 (1957).

Reversed. We do not retain jurisdiction.