LILLIAN HELLWIG, PETITIONER–RESPONDENT, v. J.F. RAST & COMPANY, INC., RESPONDENT–APPELLANT.

Argued October 26, 1987—Decided March 31, 1988.

*Robert J. Young* argued the cause for appellant (*Hoagland, Longo, Oropollo & Moran,* attorneys; *Kenneth J. Doukas, Jr.,* of counsel; *Robert J. Young* and *Kenneth J. Doukas,* on the brief).

*Patrick R. Caulfield* argued the cause for respondent (*Levinson, Conover, Axelrod, Wheaton & Grayzel,* attorneys).

The opinion of the Court was delivered by

STEIN, Justice.

We granted certification, 107 *N.J.* 636 (1987), primarily to resolve a conflict between two Appellate Division decisions that construe the provisions of *N.J.S.A.* 34:15–7.2, a section of the 1979 amendments to the Workers' Compensation law that imposes specific requirements for proof of claims based on injury or death from cardiovascular or cerebral vascular causes. *L.*1979, *c.* 283, § 3.

The Division of Workers' Compensation granted the claim of decedent's widow for dependency benefits. Before the Appellate Division, decedent's employer argued that the claim should have been disallowed because no evidence had been submitted to prove that the decedent's work effort that allegedly contributed to his death from coronary disease was more strenuous than his ordinary daily work effort. The employer contended that such proof was mandated by *N.J.S.A.* 34:15–7.2, which provides in part:

> [T]he claimant shall prove by a preponderance of the credible evidence that the injury or death was produced by the work effort or strain involving a substantial condition, event or happening *in excess of the wear and tear of the claimant's daily living* and in reasonable medical probability caused in a material degree the cardiovascular or cerebral vascular injury or death resulting therefrom.
>
> Material degree means an appreciable degree or a degree substantially greater than *de minimis.* [Emphasis added.]

The employer also relied on the opinion of another panel of the Appellate Division in *Prusecki v. Branch Motor Express,* 206 *N.J.Super.* 39 (1985), which held that the precipitating work

effort in cardiovascular claim cases must be compared with *both* the worker's daily home activity *and* ordinary work effort to support a conclusion that the injury or death was caused in a material degree by the work effort. *Id.* at 49.

In this case, the Appellate Division disagreed with the holding in *Prusecki*. It concluded that the statutory phrase "in excess of the wear and tear of claimant's daily living" was intended to insure that the critical work effort was more strenuous than claimant's daily activities "exclusive of work." *Hellwig v. J.F. Rast & Co., Inc.*, 215 *N.J.Super.* 247, 251 (1987). We affirm.

I

The facts, which are substantially uncontroverted, and the procedural history are fully set forth in the Appellate Division opinion:

> Appellant-employer, J.F. Rast & Company, Inc., appeals a judgment of the Division of Workers' Compensation, awarding Lillian Hellwig dependency benefits for the death of her husband, Thomas Hellwig, who died while working as a steamfitter on July 31, 1983. The judge of compensation found death was due to a myocardial infarction caused by stress and strain at work. Appellant contends that the proofs were inadequate to sustain a finding that decedent suffered a compensable cardiac injury within the meaning of *N.J.S.A.* 34:15-7.2. We disagree and affirm the award of dependency benefits.

> The employer does not dispute the facts presented in furtherance of the dependency petition; rather it argues that even accepting those facts the requirements of § 7.2 are not satisfied. The facts demonstrate that decedent was on his first day back at work at the Anheuser-Busch plant in Newark, New Jersey, after a seven to nine week layoff during which he had mostly remained at home doing very little. He would sit in the backyard, watch television, occasionally ride a lawnmower to cut the lawn, or go to the local store. He also reported to the union hall several times a week in an effort to obtain work apparently without success. His home and automobile were air conditioned.

> The decedent reported to work at 8 a.m. on the day of his death and was assigned the task of repairing a pasteurizer, a large machine with a series of tanks approximately 10 feet high and 30 feet long. The work was on an upper level which had to be reached by stooping under conveyors and climbing six to eight steps of a ladder situated at a 70 degree angle. Together, decedent and a coemployee raised 20 to 25 stainless steel doors on top of the pasteurizers to check for leaking sprayheads. These doors weighed approximately 35 to 50 pounds and were lifted from a cramped position, each worker using one hand,

because conveyors were overhead. The temperature in the work area was in the 80s and the humidity was high. The decedent was sweating while carrying out the inspections.

After the inspections he and his coworker walked to the maintenance shop which was down one floor and approximately 1,000 feet away. There they obtained a welding machine, a large bottle of gas and a few hundred feet of welding lead which they moved in two trips from the maintenance shop to the freight elevator. The welding machine had three wheels and weighed approximately 300 pounds and was awkward. This required the workers to push and pull it to the elevator. Decedent carried approximately 100 pounds of the welding lead to the elevator and the two then moved the equipment from the elevator to the pasteurizer by bending under conveyors and pushing and pulling the equipment. At approximately 9:30 they took a 15 to 20 minute coffee break and then decedent went to the bathroom. When he returned he made a couple of more trips up and down the ladder. His coemployee began welding and asked decedent to go down the ladder and adjust the welding machine. The coworker later noted that the machine had been adjusted but that the decedent did not return. This caused the coworker to look over the side where he saw decedent lying unconscious with other workers ministering to him.

Decedent did not regain consciousness and an autopsy revealed "[a]theros-clerotic cardio-vascular disease, severe; acute inferior wall myocardial infarct." The medical expert called on behalf of petitioner testified that decedent died of an acute myocardial infarction which occurred when the work effort produced an increase in the heart rate and blood pressure causing a rupture of an atheromatous plaque which in turn caused an occlusion of the blood supply to the heart, resulting in arythmia and death. This doctor considered that the plaque probably ruptured during the work effort before the coffee break and that the infarction occurred at the time of death. The testimony of the employer's medical expert was that the decedent's death was caused by an episode of fatal ventricular fibrillation which was the result of the natural progression of the coronary artery disease from which he suffered. This expert was of the opinion that the autopsy did not demonstrate an infarction.

The judge of compensation found that decedent's work effort was strenuous and in excess of the wear and tear of daily living which he found to be quite sedentary. He was led to the "inescapable conclusion that the work effort was significantly and substantially in excess thereof." The judge found that the effort caused in a material degree an infarction which led to petitioner's sudden death. He found the opinion of the expert called on behalf of decedent to be far more acceptable than that of the employer's. [215 *N.J.Super.* at 248–50.]

The Appellate Division acknowledged that the evidence before it was not sufficient to permit the finding required by *Prusecki, supra,* 206 *N.J.Super.* at 49, that the work effort that led to the employee's death was in excess of that ordinarily and regularly encountered in his workplace. 215 *N.J.Super.* at 250. The court concluded, however, that such a finding was not

required by the statute. After reviewing essentially the same decisions considered by the *Prusecki* court, as well as the legislative history of the 1979 amendment, the Appellate Division panel determined that

the Legislature intended no more than to require that the cardiovascular accident be caused by the work effort or strain involving a substantial condition in excess of the "wear and tear.of the claimant's daily living" exclusive of work. [215 *N.J.Super.* at 251.]

We come to the same conclusion based on our review of *N.J.S.A.* 34:15–7.2, in the context of the judiciary's prolonged struggle with the standard of compensability in workers' compensation cases for illness or death caused by coronary disease.

## II

■ The Appellate Division panels in this case and in *Prusecki* agreed that the correct interpretation of *N.J.S.A.* 34:15–7.2 depends to a significant degree on a trilogy of workers' compensation cases involving coronary disease: *Seiken v. Todd Dry Dock, Inc.*, 2 *N.J.* 469 (1949); *Ciuba v. Irvington Varnish & Insulator Co.*, 27 *N.J.* 127 (1958); and *Dwyer v. Ford Motor Co.*, 36 *N.J.* 487 (1962). In *Seiken* petitioner was a shipyard foreman who did heavy maintenance work about the yard and piers. His first encounter with symptoms of heart disease occurred when he experienced severe chest pains and shortness of breath while he and a co-worker were lifting a piece of scrap metal, weighing between two hundred and two hundred fifty pounds, onto an adjacent truck. According to the evidence, petitioner's work effort at the time of the incident was consistent with his ordinary and routine duties. Reversing a lower court decision granting compensation, this Court referred to the "presumption that injury or death from heart disease is the result of natural physiological causes." 2 *N.J.* at 475. In order for a claimant to prove that the employment was a contributing factor, the Court held that

something of an unusual strain or exertion beyond the mere employment itself is required to establish liability; the mere showing that the claimant was

performing his routine, everyday tasks, when he suffered a heart attack does not establish a right to workmen's compensation. [*Id.* at 476.]

The rigid rule of *Seiken* prevailed until the Court decided *Ciuba, supra,* 27 *N.J.* 127, in 1958. The employee in the *Ciuba* case was stricken shortly after completing the installation of an oven drive-shaft unit weighing between two hundred and three hundred pounds. He died ten days later. The claimant's medical expert testified that the extreme heat, cramped quarters, and physical effort involved in the work, combined with the worker's preexistent coronary disease, induced an acute myocardial infarction that ultimately was the cause of death. The evidence was that the physical effort expended on the occasion in question was consistent with the employee's customary duties.

The Workmen's Compensation Bureau dismissed the petition since there was no proof that the work was "more strenuous than that for which [the deceased workman] had been hired and which he customarily performed," 27 *N.J.* at 134, and the County Court affirmed. Reversing, this Court specifically overruled its earlier decision in *Seiken v. Todd Dry Dock, Inc., supra,* 2 *N.J.* 469, and concluded that an accident within the meaning of the statute occurs

where a heart ravaged by disease succumbs to strain or exertion arising from the doing of the master's work, even though it be but a normal incident of the service, in no sense extraordinary, and such as a sound heart could withstand. It is basic to the statutory policy that, if strain or exertion attending the rendition of the service aggravates or accelerates the progress of a pre-existing physical infirmity or condition due to either trauma or disease, and disability or death ensues, there is a compensable accident and injury. Such is an untoward event, unintended and unexpected within the concept of the statute. The essential inquiry is whether the disabling injury or death is causally related to strain or exertion attendant on the doing of the master's work. [27 *N.J.* at 134–35.]

In adopting the rule that ordinary work effort could cause a compensable accident, the Court relied on English decisions construing the prototype of New Jersey's original Workmen's Compensation Act, particularly *Clover, Clayton & Co., Ltd. v.*

*Hughes,* [1910] A.C. 242, where the concurring opinion of Lord Macnaghten observed:

> The fact that the man's condition predisposed him to such an accident seems to me to be immaterial. The work was ordinary work but it was too heavy for him. [*Id.* at 250.]

Although the Court overruled *Seiken,* it reaffirmed the validity of the presumption that "injury or death from heart disease is the result of natural physiological causes," 27 *N.J.* at 138, but held that the proof of work-induced injury was sufficient:

> The essential question is whether strain or exertion incident to the work accelerated the worker's death. Would his death have occurred when it did if it had not been for the work in which he was engaged? Presumably, he had suffered from heart and arterial insufficiency. There was evidence of lowered stamina for a year before the mortal seizure; but the inference is well-nigh irresistible that physical exertion attending the doing of the work aggravated his disease and weakness of heart and brought on the fatal collapse. The evidence fairly excludes the hypothesis of death as the consequence of disease alone.
>
> True, the occlusion and the exertion may have been a co-incidence. But the exertion could have precipitated the occlusion to which the decedent was predisposed by disease; and that such was the case is the probable or more probable hypothesis with reference to the possibility of other hypotheses. Indeed, the existence of a causal relation in these circumstances would seem to be well grounded in common knowledge and experience. [*Id.* at 140.]

*Dwyer v. Ford Motor Co.,* 36 *N.J.* 487 (1962), the most recent case of the critical trilogy of heart disease cases, is of special significance because it was targeted by the Joint Statement to the Senate and Assembly Committee Substitute Bills that resulted in the enactment of *N.J.S.A.* 34:15–7.2. In *Dwyer,* the precise issue raised was the quality of proof that was necessary to establish that the employee's death from coronary disease was work-related to a material degree. The complexity of the causation issue was compounded both by the worker's prior history and the circumstances of his death on April 30, 1958. Dwyer first experienced symptoms of coronary disease in May 1956, for which he was hospitalized, and, when released, he did not return to work for three weeks. He experienced chest pains and other symptoms of coronary disease in December 1956 and in February 1957, and consulted his physician on both occasions. He next required medical attention on April 27,

1958, three days prior to his death, when he experienced severe pain in his chest and left arm, shortness of breath, and numbness in the left hand. His physician diagnosed coronary insufficiency and prescribed nitroglycerin pills. Dwyer did not work his regular three-thirty to midnight shift on April 28 but did report to work on April 29. A co-worker whom Dwyer drove to work described Dwyer as "pale, drawn and fatigued looking" during the trip, 36 *N.J.* at 500, and observed Dwyer put a pill in his mouth while driving.

Testimony by co-workers at the compensation hearing disclosed that Dwyer displayed signs of fatigue during the workday while performing his customary duties, that he looked "white, strained and started to puff after lifting a barrel, walked slowly, took a nitroglycerin pill" during the meal break but did not eat, and generally "looked as though he could not carry on his work." *Id.* at 501.

Dwyer arrived home after midnight, complaining of severe chest pain. Unable to reach his doctor, his wife telephoned the police who transported him to a local hospital. Electrocardiograms taken at the hospital disclosed "acute coronary occlusion with posterior wall infarction." *Id.* at 502. Dwyer died at 3:20 a.m., fifty minutes after he had been admitted to the hospital. *Ibid.*

Predictably, the expert witnesses for petitioner and respondent disagreed on whether Dwyer's work effort contributed to his death. Petitioner's expert expressed the view that for an individual with Dwyer's history and recent symptoms

> inactivity is advisable because repeated physical exertion puts a greater demand on the heart for blood, and if the patient is suffering from coronary insufficiency the greater demand, if it could not be accommodated, would result in increased coronary insufficiency and eventuate in an acute myocardial infarction. And in this case the repeated work exertion during the day, as described to him, coupled with the evidence of puffing, physical slowing down as the work progressed, and the worsening of his appearance, provided a "clear indication" that Dwyer's cardiovascular condition kept deteriorating during the work interval, so that he became a "very sick man" by the time he went home. In sum, [the expert] asserted that on the total history the cumulative effect of the repeated exertion (which was inadvisable for a person who had had previous

attacks of this type of coronary insufficiency) was such as to increase the extent of his coronary insufficiency so as to be a major contributing factor in producing an acute myocardial infarction. [*Id.* at 503–04.]

Respondent's expert disagreed, expressing the view that because of Dwyer's medical history he could not conclude that there was any causal connection between the work effort and Dwyer's death unless there had been a "stress or strain incident just prior to the onset of his initial symptom which is usually pain." *Id.* at 504.

The Court determined that a preponderance of the evidence established a causal connection between Dwyer's work effort on April 29 and his death shortly thereafter:

Consideration of the entire factual framework in which this decedent's fatal heart attack has been presented stimulates in us a strong feeling of probability that the succession of employment strains described—as distinguished from a single incident immediately followed by pain or other symptoms—participated in a material way in the acceleration of the attack. We are convinced that the series of exertions so acted on the seriously diseased heart as to join with it to an appreciable extent in hastening the fatal attack. Our emphasis is placed on the total or cumulative effect of the work effort, and not on any single act or any single exertion beyond that usually associated with the work, because of the uncertainty previously mentioned as to the underlying concept on which benefits were denied by the tribunals below. [*Id.* at 508–09.]

Concurring in the result, Chief Justice Weintraub highlighted the conflict between medical experts over the kind of proof that was scientifically essential to prove causation in such cases. He summarized the position of the employer's expert as follows:

[B]efore a medical expert could find work effort did play a baneful role, it must appear that some specific effort was followed by some sign or symptom of injury, for otherwise the witness, however expert, would merely be guessing. [*Id.* at 515.]

He noted the conclusion of petitioner's expert that "the cumulative effect of repeated exertion" contributed to the employee's death, but emphasized the lack of any finding by that expert "which *specifically* evidenced a worsening *due to work* rather than to the material progress of the disease alone." *Ibid.* (emphasis supplied).

In that context, the Chief Justice noted that the difficulty in adjudicating coronary disease compensation cases may be attributable to conflicting views within the medical profession:

> It may well be that the ultimate opinions of these experts hinged upon doctrinal differences with respect to minimum criteria necessary to show medically that a causal connection existed. Neither witness was interrogated along those lines. Perhaps if it were developed that the profession is divided upon the subject and there were an extensive discourse upon the contending theories with the scientific support for them, I could make an informed choice. On the present record, I think I must start with the agreed proposition that the work effort could have played a part, and superimposing the day's work upon the grievous illness, I get the feeling that decedent probably became the worse for it. Thus I concur in the result reached by the majority.

> But I appreciate regretfully that my reaction to this factual complex can be of no help in another case. It is but a gross reaction rather than a demonstrable product of a step-by-step analysis. When the possibility of causal connection is accepted, we cannot deny relief in all cases simply because science is unable decisively to dissipate the blur between possibility and probability. In such circumstances judges must do the best they can, with the hope their decisions square with the truth, and with a willingness to consider in succeeding cases whatever contribution scientific advances may offer.

> This rough basis for decision is not a happy one. A process which leads to an all-or-nothing result in so murky an area is not truly just either to the individual litigants or to the larger interests in the industrial scene. It may well be that until the medical profession can give us dispositive help, some arbitrary compromise would be the more tolerable course. This must be left to the other branches of government which alone can fashion a remedy of that quality. [*Id.* at 515–16.]

Reference to two other observations by the *Dwyer* Court is essential to a full understanding of the 1979 amendment. First, in describing the work effort required to establish causation, the Court observed that

> [b]enefits are not lost because the amount of the work stress was such that it might or could be duplicated in routine activity about the home or in customary movements or effort while there. [*Id.* at 492.]

Secondly, the standard for determining the quantum of proof required to establish causation was described as follows:

> Such claimant has the burden of showing by the preponderance of the believable evidence that the ordinary work effort or strain in reasonable probability contributed in some material degree to the precipitation, aggravation or acceleration of the existing heart disease and the death therefrom. In this context, the significance of "some material degree" cannot be stated with mathematical

precision. It means an appreciable degree; a degree greater than *de minimis* * * *. [*Id.* at 493.]

The legislature plainly expressed its intention to modify the holding in *Dwyer*, stating when it enacted the 1979 amendments to the Workers' Compensation Act that:

This legislation would benefit employers by:

\*      \*      \*      \*      \*      \*      \*      \*

(2) countering the far-reaching effects of *Dwyer v. Ford* in cardiac claims by requiring that a petitioner prove that the injury or death involved substantial effort or strain which was in excess of the rigors of the claimant's daily living and that the cause of the injury or death was job-related in a material degree. [Joint Statement to Senate Committee Substitute for Senate, No. 802 and Assembly Committee Substitute for Assembly, No. 840.] [1]

As the Appellate Division panels in this case and in *Prusecki* acknowledge, *N.J.S.A.* 34:15–7.2 specifically modifies the statement in *Dwyer* referred to above, *supra* at 48, that "[b]enefits are not lost because * * * the work stress * * * could be duplicated in routine activity about the home * * *." 36 *N.J.* at 492. The statute mandates that the "work effort or strain [must be] in excess of the wear and tear of the claimant's daily living." This language would appear to require proof that the strain of the work effort that allegedly precipitated the worker's disability or death from coronary disease was qualitatively more intense than the strain of the physical activity to which the worker was accustomed in his leisure time. Thus, in the case of a claim asserted on behalf of a recreational jogger, evidence of the intensity and duration of the work effort would be compared with proofs of the stress and strain customarily expended by the claimant in his non-work activities. *See* Lefelt, *Workers' Compensation in New Jersey: A Critique of S–802*, 104 *N.J.L.J.* 425, 438 (Nov. 15, 1979). It is self-evident that such comparisons will be difficult and imprecise since no simple

---

[1]The Press Release issued by the Governor's Office was restrained in its characterization of *N.J.S.A.* 34:15–7.2:

A slightly less strict definition of compensable heart injuries has been adopted. [Press Release, Office of the Governor, Jan. 10, 1980.]

formula can be invoked to compare, for example, several hours of strenuous work on an assembly line with a thirty-minute run. We are confident that the workers' compensation judges will review such proofs pragmatically and in a manner consistent with the legislative intent.

Another self-evident modification of *Dwyer* resulting from *N.J.S.A.* 34:15–7.2 relates to the phrase "material degree," expressed in the context of the requirement in *Dwyer* that the work effort contribute "in some material degree to the precipitation, aggravation or acceleration of the existing heart disease * * *." 36 *N.J.* at 493. In *Dwyer*, the Court described material degree as meaning "an appreciable degree; a degree greater than *de minimis* * * *." *Ibid.* The legislature redefined material degree to mean "an appreciable degree or a degree *substantially greater than de minimis.*" *N.J.S.A.* 34:15–7.2 (emphasis added).

In addition, *N.J.S.A.* 34:15–7.2 requires that the work effort or strain "involving a substantial condition, event or happening * * * in reasonable medical probability caused in a material degree the cardiovascular * * * injury or death resulting therefrom." This language contrasts with the *Dwyer* formulation that the work effort or strain "contributed in some material degree to the precipitation, aggravation or acceleration of the existing heart disease and the death therefrom." 36 *N.J.* at 493. Both the similarities and the differences in the *Dwyer* standard and the legislature's standard for determining causation persuade us that the legislature plainly intended to change the quality of proof necessary to establish that a coronary incident is work-related. We will address below the nature of the medical proofs that should be required to satisfy the statutory standard. We deal first with respondent's contention that the legislature intended a return to the standard of *Seiken, supra,* 2 *N.J.* 469, requiring proof that the relevant work effort was an unusual effort or strain, greater than that required of the employee in the ordinary course of his duties.

We note, as did the Appellate Division, 215 *N.J.Super.* at 252, that the original version of *N.J.S.A.* 34:15–7.2, introduced as S–802 (Feb. 9, 1978), would have expressly required "that the work effort or strain alone involved an event or happening beyond the normal and routine duties of his employment." [2] The Senate Committee substitute for S–802, however, deleted this language, apparently in response to criticism from representatives of organized labor, and in its place imposed the requirement that "injury or death was produced by the work effort or strain involving a substantial condition, event or happening in excess of the wear and tear of claimant's daily living * * *." *N.J.S.A.* 34:15–7.2. *See* Boyan, *Key Workers' Compensation Opinions Go Unpublished,* 117 *N.J.L.J.* 203, 219 (Feb. 20, 1986). The specific requirement that the work effort or strain involve a "substantial condition, event or happening" does not mean that a worker's ordinary work effort is insufficient to establish causation. Rather, the statutory language is designed to focus attention on the intensity and duration of the precipitating work effort or strain in evaluating its capacity to cause cardiac dysfunction.

In our view the legislature's decision to reject the return to the *Seiken* standard is quite clearly reflected by the omission from the bill in its adopted form of the restrictive language contained in the original version of S–802. The legislature used specific language to address those aspects of the *Dwyer* holding it sought to modify. If the legislature intended to revive the *Seiken* standard, or adopt a variation of that standard as suggested by the Appellate Division in *Prusecki,* 206 *N.J.Super.* at 49, it would have conveyed that intention explicitly. *Accord Perno v. Ornstein Fashions, Inc.,* 196 *N.J.Super.* 174, 182 (App.Div.1984).

---

[2] A thoughtful criticism of the unusual-exertion test is found in Larson, *The "Heart Cases" in Workmen's Compensation: An Analysis and Suggested Solution,* 65 *Mich.L.Rev.* 441, 465–68 (1967).

Accordingly, we reject the employer's contention that *N.J.S. A.* 34:15–7.2 imposes a categorical requirement that a claimant's work effort that causes cardiovascular injury or death cannot result in a compensation award unless it exceeds that claimant's ordinary or routine work effort.

### III

That conclusion, however, does not necessarily dispose of the employer's remaining contention that the legislature intended through *N.J.S.A.* 34:15–7.2 to require a significantly enhanced quality of proof to support compensation awards in cases involving coronary injury or death. As noted, one such enhancement results from the requirement that the work effort exceed the "wear and tear of the claimant's daily living," which we construe to mean daily activities outside of the workplace. Our reading of the statute in relation to the specific criteria set forth in *Dwyer*, however, suggests that the legislature intended to require more than just a comparison of the claimant's work effort with his outside activities. We focus now on the balance of the statutory test, that the work effort "involving a substantial condition, event or happening * * * in reasonable medical probability caused in a material degree the cardiovascular * * * injury or death resulting therefrom." *N.J.S.A.* 34:15–7.2. We recall that in *Dwyer* it was the conflict between the medical experts' testimony on causation that provoked Chief Justice Weintraub's concurring opinion, *supra* at 46, and prompted Justice Haneman to observe in dissent:

> [T]here is next presented the question whether, under the particular facts, that causal nexus between the specific employment duties of the claimant and the fatal seizure has been sufficiently demonstrated. As in so many cardiac cases, we have here two intellectually honest experts, each professing a contrary opinion as to the probable medical causal relationship.
>
> \* \* \* \* \* \* \* \*
>
> * * * I quite frankly confess my inability to evaluate the contradictory testimony of the two recognized cardiological authorities to the end that I can say which medical doctrine has been proven by a preponderance of the believable evidence. This is particularly so in the light of the inability of skilled and

nationally recognized authorities to agree either on the medical criteria for establishing causation or whether causation can even exist in the type heart episodes have presented.

\* \* \* \* \* \* \* \*

\* \* \* The proof of causal connection between employment duties and a cardiac episode is deficient if, as here, the court is obliged to resort to conjecture, speculation, guess or hunch in order to embrace a medical thesis which makes such connection probable. [36 *N.J.* at 522–24.]

As suggested by the concurring and dissenting opinions in *Dwyer,* greater agreement in the scientific community about the standards for determining causal relation between work effort and cardiac dysfunction would assist compensation judges in their effort to evaluate conflicting expert testimony. For example, we note that in 1977 the American Heart Association's Committee on Stress, Strain and Heart Disease suggested guidelines for determining the causal relationship between occupational and non-occupational stresses and heart disease, "particularly in the fields of Workmen's Compensation, disability evaluation, and other medico-legal areas." American Heart Association: Report of the Committee on Stress, Strain and Heart Disease, *Circulation,* 55:825A, 826A (1977).[3] According

---

[3]The Committee's Report sets forth the following conclusions:

V. Conclusions: Cause and Effect Relationships—Stress and Heart Disease

Based on the preceding discussion the following statements should govern the assessment of the effects of stress upon heart disease.

A. Long-term, repetitive strenuous physical effort regularly performed by an individual cannot be regarded as a causal element in the development of artherosclerosis. Such activity, if having any role, is believed to be beneficial.

B. Long-term repeated strenuous physical effort in some persons with underlying heart disease may result in the onset of congestive heart failure sooner than might have occurred without such effort expenditure. However, at the present stage of medical knowledge it is not possible to determine precisely when cardiac insufficiency would have occurred during the natural history of the underlying disease or from normal "wear and tear of life" without the indicated stress.

C. Continued emotional stress to which an individual may be subjected over a period of months or years has come under scrutiny as possibly playing a causative or worsening role in the acceleration of the progression

to one commentator, who also served on the Committee, "the conclusions of this committee are currently valid without modification, have not been supplanted by any other formal set of medical causality guidelines, and are generally accepted by the medical profession." Sagall, *Cardiac Examinations for Legal Purposes*, in THE HEART (6th ed. 1986), at 1571.

We express no view on the validity or continued reliability of the Committee's conclusions. We take note, however, that its Report includes these findings:

1. Medical science is incapable of determining precisely when a person with underlying heart disease will experience cardiac insufficiency as a matter of course, without regard to the stress of work effort.

2. Physical or emotional stress of sufficient intensity and duration can elicit "adverse responses which might trigger or hasten certain cardiac lesions and dysfunctions."

---

of artherosclerotic disease. This postulated relationship is not an established scientific fact, although the possibility of some contribution cannot be excluded in some instances. Recent investigation concerning the possible role of psychological factors in atherogenic heart disease point to the effects of such stress, if any, as dependent to a large extent upon the personality makeup of the individual rather than on the specific quality of the psychological experience.

D. A single isolated episode of stress (physical or emotional) in individuals rendered susceptible because of underlying heart disease, if of sufficient intensity and duration, appears capable of eliciting adverse responses which might trigger or hasten certain cardiac lesions and dysfunctions. These may include angina pectoris, a cardiac dysrhythmia, acute congestive failure or possible myocardial infarction.

E. The shorter the time interval between the exposure to a potentially noxious stimulus and the appearance of clinical or pathologic evidence of new heart disease or dysfunction, the more likely is there to be a causal relationship. Conversely, the farther apart they are in time, the less likely is a cause and effect relationship.

F. The exposure of a person with underlying heart disease to a stimulus potentially harmful does not necessarily mean that a harmful cardiovascular response will be elicited, even when such exposure would be advised against medically because of the possibility of resulting harm. [*Id.* at 830A.]

3. The likelihood of causal relation between physical stress and heart dysfunction is directly related to the time interval between the "stimulus" and the "evidence * * * of dysfunction."

It is self-evident that compensation judges should be informed of contemporary medical standards so that they may be knowledgeable and circumspect in their assessment of conclusory expert testimony in heart cases. We view the legislature's modification of the *Dwyer* criteria as an effort to require more reliable proof of the connection between work effort and cardiac dysfunction. The legislature's use of the phrase "substantial condition, event or happening," its redefinition of "material degree," and the requirement that the work effort "caused * * * the injury or death" all constitute enhancements of the standards set forth in the *Dwyer* opinion.

Accordingly, an expert witness's conclusion in a heart compensation case that work effort "caused in a material degree the cardiovascular * * * injury or death" should be carefully evaluated in the context of both the statutory criteria and prevailing medical standards. As noted, the work effort should be measured against the "wear and tear of claimant's daily living," exclusive of work. The evaluation also should take into account the worker's medical history, the intensity and duration of the precipitating work effort, and the time interval between the work effort and the evidence of heart dysfunction. Compensation judges should be particularly skeptical of expert testimony that supports or contests a finding of causation on the basis of reasoning inconsistent with prevailing medical standards.

The record before us suggests that the decision to award compensation in this case was influenced by the magnitude of the work effort and the relatively short interval between the work effort and decedent's loss of consciousness. No evidence was adduced to suggest that the decedent's activities outside of work were as vigorous as the work effort on the date of death.

Considering the intensity and duration of the work effort, the fifteen- or twenty-minute coffee break, followed by the resumption of work and the decedent's collapse, we would not disturb the compensation judge's conclusion that the "work effort was strenuous and did, in fact, cause in a material degree the cardiovascular death resulting therefrom."

The judgment of the Appellate Division is affirmed.

*For affirmance* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal* —None.