294 N.J. Super. 252 (1996)
683 A.2d 212
ALBERT J. DIETRICH, PETITIONER-APPELLEE,
v.
TOMS RIVER BOARD OF EDUCATION, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 26, 1996.
Decided October 16, 1996.
*253 Before Judges SHEBELL, BAIME and P.G. LEVY, JJ.
*254 Thomas E. Monahan argued the cause for respondent-appellant (Gilmore & Monahan, attorneys; Stephen K. Foran, on the brief).
Frank S. Salzer argued the cause for petitioner-appellee (Curry & Salzer, attorneys; John Marut, on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
Toms River Board of Education (respondent), appeals from a judgment of the Division of Workers' Compensation awarding its former Superintendent of Schools, Albert J. Dietrich (petitioner), permanent disability of 85% of partial total, 35% cardiac and 50% neuropsychiatric. We are called upon to determine whether the record supports the findings of the Judge of Compensation that petitioner's heart and psychiatric problems were shown to be sufficiently related to stress from the employment. The issue revolves in main part around the Judge's determination that "[p]etitioner sustained an aggravation of his cardiac condition by his employment with respondent." In this regard, we must decide whether the record supports a conclusion that petitioner's idiopathic myocardiopathy was aggravated in a material degree by the stressful conditions that characterized his employment and that the stress was a substantial condition in excess of the wear and tear of his daily living. See Fiore v. Consol. Freightways, 140 N.J. 452, 659 A.2d 436 (1995).
On December 18, 1991, petitioner filed an Employee's Claim Petition alleging that due to "[e]xposure to significant stress," as Superintendent of Schools for the Toms River Board of Education, he suffered "[p]ermanent cardiovascular and neuropsychiatric disability." The respondent filed its Answer contesting both the nature and extent of the injuries and disability, and specifically asserted "[t]he injury resulting from the alleged residual disability are insufficient to form a basis upon which a compensation award can be rendered under the provisions of the revised Workers' Compensation Award Act of 1/1/80." We agree with respondent's *255 view of the case and we reverse the Judgment dated March 22, 1995.
Petitioner was appointed Superintendent of Schools by respondent in 1980 and he served continuously in that capacity until May 14, 1991. As superintendent, the petitioner worked hand-in-hand with the Board of Education and was responsible for what developed over the years into an annual budget of approximately $130 million, 2,600 to 2,800 employees, eleven elementary schools, three intermediate schools, three high schools, and an alternative school. On May 14, 1991, petitioner was admitted to the hospital for a brief stay, and never worked again. He formally retired as Superintendent on December 12, 1991, at the age of fifty-five.
Petitioner experienced chest pains, shortness of breath and cold sweats in April of 1991 while attending a budget meeting. He was seen by a doctor and told to rest. Nonetheless, he continued to work each day, and his complaints continued off and on. Around May 11, 1991, he began experiencing sleeplessness, nervousness, and his left arm bothered him. Petitioner described May 13, 1991 as a normal day at work. However, early on May 14, 1991, while at work, he started with a headache, cold sweats, and pains in his chest radiating down his left arm. He also had some blurred vision and felt warm like his blood pressure was going up. These symptoms were described as flu-like symptoms. Petitioner was admitted to Community Medical Center in Toms River where he stayed until May 17, 1991. He was discharged with the following diagnosis: 1) chest pain (acute myocardial infarction ruled out); 2) upper respiratory infection; 3) atrial arrhythmia; and 4), diabetes mellitus.
On June 24, 1991, petitioner re-entered Community Medical Center for a heart catheterization. There was a finding of global hypokinesia and the left ventricle demonstrated an ejection fraction of 44%. This was considered to be "somewhat" below the normal 50%. The coronary arteries were found to be normal. A follow-up MUGA scan, which utilizes radioactive dye, found the ejection fraction to be 61%. However, the test was considered to *256 be of limited value "due to the poor sensitivity of the study." The final diagnosis of the treating cardiology group was idiopathic cardiomyopathy.
In a letter dated April 13, 1992, petitioner's treating cardiologist, Dr. Pasquariello, wrote:
In summary, Mr. Dietrich is a 55 year old male with a history of an idiopathic cardiomyopathy. His ejection fraction is 44%, which means that the patient's left ventricular function is depressed. This is consistent with a decrease in overall cardiac performance of a mild degree, however, cardiomyopathies of this nature tend to be progressive and it was for this reason we advised Mr. Dietrich that it would be appropriate for him to retire. Physical and emotional stresses may adversely affect the outcome and prognosis of any individual with a depressed left heart function. He has been maintained on medical therapy. There has been no obvious progression since the diagnosis was initially made. However, there has also been no significant improvement. The patient has had a complete cardiovascular work-up without obvious causative nature of this disease being detected and therefore it is considered an idiopathic process. He has remained stable and he was last seen on December 27, 1991 and we expect to see him again in June of 1992.
[Emphasis Added.]
The testimony showed that petitioner's job at times involved a high level of stress. As petitioner was responsible for an annual budget, for several months each year he worked from ten to twelve hours a day, six to seven days a week. Because of the public nature of his work, petitioner often received criticism from persons seeking seats on the Board of Education. Even though he had tenure, petitioner was concerned at each election as to who would win, as he had to work closely with the board members. He also received harassing or "hang-up" phone calls which he attributed to his work, although the callers were never identified. His wife was followed in her car because it looked like a "company car" and petitioner believed someone was trying to pin something on them. In 1983, a bullet was fired through petitioner's home in Toms River, while he and his wife were in Europe. Petitioner's son testified at trial that around that time he had caught men looking into the house and trespassing on their property. No testimony related the shooting or trespassing to any particular work situation.
*257 Petitioner called Dr. John Cavalieri, a Board of Education physician, who, beginning in 1988, treated petitioner for diabetes and hypertension. The doctor stated petitioner was under a lot of stress with the school system and that his heart condition was stress induced. He did not, however, treat petitioner for his cardiac problem and never saw the petitioner in the hospital. He nonetheless opined that petitioner's cardiovascular condition was caused by the stress raising petitioner's blood sugar. He did not do any tests of petitioner's sugar levels at the time the symptoms became acute. He told petitioner not to return to work because he was concerned that petitioner was going to have a stroke or heart attack due to stress at work.
Dr. Chester Trent, a psychiatrist, began treating petitioner for depression on June 17, 1991. Petitioner was no longer working at this time and he had not worked since May 14, 1991. Dr. Trent saw him approximately once a month for less than a year, during which time he prescribed no medication. Dr. Trent advised petitioner to retire and stated that he thought (the doctor lost his records) petitioner had come to him with symptoms of severe stress and that this stress was impacting on petitioner's physical condition. Dr. Trent also testified that petitioner had obsessive or abnormal thoughts that could have been related to his heart condition. The psychiatrist explained:
Well, certainly he had a lot of pressure, he had family pressures, emotional pressures resulting from his job activity and absolutely, he was worried about his heart.
Petitioner, when asked at trial "[w]hat complaints, problems and discomforts have you had over the last six months?", candidly responded:
A. Over the last six months I would say that things have been basically, you know, getting  there's been a great deal of improvement since I have been out of the work place, in fact, I saw doctor  I'm trying to think, Fortunato the other day. He was over there for a regular test and everything was fine. He was telling me it was the best thing I had done probably.
....
Q. From a psychological standpoint, do you feel better since leaving the Board of Education?

*258 A. Yes.
Q. Do you continue to have problems or complaints in that regard?
A. No.
Dr. Edward Dengrove, a Board certified psychiatrist, semiretired from practice, also testified as an expert on behalf of petitioner as to causality and the extent of disability on petitioner's neuropsychiatric claim. He said petitioner ripped at his fingernails, was tense and slightly restless, and that his face appeared flushed and concerned. Dr. Dengrove's diagnosis was one of a depressive reaction with features of anxiety. He estimated the psychiatric disability at 50% of partial total.
Petitioner called Dr. Rowland Goodman, who was Board certified in internal medicine, but not cardiology. Dr. Goodman stated that in his 32 years of testifying extensively in court proceedings, "[o]nce I testified for a respondent." He agreed petitioner's cardiomyopathy was idiopathic. However, according to Dr. Goodman, stress was superimposed upon the heart, thus aggravating the condition. Dr. Goodman stated that petitioner's work strain was above the wear and tear of his daily life, which was described as sedentary. Dr. Goodman opined that petitioner's condition was aggravated, accelerated, and exacerbated by the stress of his employment. He reasoned as follows:
As I said, when this physiological stress brought on by emotional stress and the harassment impinges upon the man's body, upon his adrenal glands, and eventually his heart, and you end up just as this man did, in the hospital with an atrial arrhythmia, ruling out coronary artery disease and evidence of the weakening decreased function of the heart to only 45 percent of form [sic].
Therefore, from my point of view, my opinion is that there is direct causal relationship between the emotional stress, strain and tension as described in the hypothetical question and the cardiomyopathy, the condition for which he was hospitalized at Toms River Hospital on May 14, 1991; and therefore, from this for residuals of that, which I found when I examined him, of 35 percent of total.
Dr. Edwin L. Rothfeld, called to testify by respondent, was the only Board certified cardiologist to testify in the case. He gave his background as follows:
I served my internship and residency in internal medicine at Newark Beth Israel Medical Center. I then served a cardiac fellowship combined at the same hospital and the New York Mt. Sinai Medical Center from 1960 to 1962.

*259 I was in the United States Naval Hospital in Corpus Christi, Texas in charge of the cardiology wards. I returned to Newark Beth Israel Center in 1962 as director of the cardiac fellowship and director of the heart station.
I also served as chief of cardiology up to 1989. I was Board certified in internal medicine in 1963, and recertified in 1974. I'm also Board certified in the subspecialty board of cardiovascular disease in 1966.
I am a clinical professor of medicine at the University of Medicine and Dentistry in New Jersey, and I'm currently director of the heart station at the Newark Beth Israel Medical Center.
....
[I teach] [b]oth at the Newark Beth Israel Medical Center and University of Medicine and Dentistry in New Jersey and Newark as well as at the Mt. Sinai Medical Center in New York.
....
I teach basically cardiology and internal medicine.
He testified that he had seen in excess of a thousand cases of cardiomyopathy.
Dr. Rothfeld diagnosed a global idiopathic cardiomyopathy. The doctor defined "idiopathic cardiomyopathy" as meaning "a heart muscle disease whose causality we don't know." When asked to define cardiomyopathy, he stated:
[I]t comes from two prefixes and one suffix. Cardio, heart; myo, muscle; pathy, disease of. Basically, it's a disease of the heart muscle meaning that it spares the other components of the heart; that is to say, it spares the inner lining, that's the endocardium; it spares the valves; and it spares the outer lining of the heart, the pericardium.
Also for most people it is not due to coronary heart disease, so the coronary arteries are normal as well. Strictly speaking, cardiomyopathy may be defined as a disease entity restricted to heart muscle and sparing the other components of the cardiac structure.
Dr. Rothfeld testified that there is no scientific evidence to support the contention that emotional stress causes or aggravates cardiomyopathy. In response to whether or not evidence exists that emotional stress causes or aggravates cardiomyopathy, Dr. Rothfeld stated:
Based on my experience and careful review of pertinent literature, I found no scientific evidence to support that contention.

*260 As a matter of fact, there is a so-called down setting of these sympathetic receptors to the heart muscle and idiopathic cardiomyopathy, so that these people are probably less susceptible to emotional stimuli than others.
We must not confuse cardiomyopathy with coronary heart disease. Now, coronary heart disease can be aggravated by emotional stress because coronary heart disease is basically an imbalance or manifestation of an imbalance between oxygen demands and oxygen supply; and if the demand goes up because of a sudden emotional stress, it's possible that the demand will outstrip the supply with adverse consequences.
However, oxygen demand and supply is not a factor in idiopathic cardiomyopathy. So my answer to the question is, no.
Dr. Rothfeld concluded that petitioner had not suffered a cardiac condition which had been either caused or aggravated by his work. He explained: "idiopathic cardiomyopathy is not coronary heart disease, it does not represent an imbalance between oxygen supply and oxygen demand." He added that because the disease sets down sympathetic nerve receptors to the heart muscle, the patient is less susceptible to emotional stimuli and that there is nothing in the literature to support a connection either by causation or aggravation.
Respondent also called an expert, Dr. Walden Holl, a Board certified psychiatrist, who examined the petitioner and found that he suffered from reactive anxiety and reactive depression. In Dr. Holl's opinion, this disability was caused by the stress petitioner created when confronted with his cardiac condition. Put simply, petitioner experienced stress and became depressed when he thought about his heart condition. Dr. Holl also testified that the determination of whether or not stress or any psychiatric type of factors cause cardiac disease is "very much up for grabs" and has not been settled. He stated that he was aware of articles on both sides of the issue. In any event, he believed the answer had to come from a cardiologist and not a psychiatrist. Dr. Holl did not estimate permanent disability.
The standard governing the scope of appellate review of workers' compensation cases is well established. The test is "`whether the findings made could reasonably have been reached on sufficient credible evidence present in the record,' considering *261 `the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility." Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965) (quoting State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964)). Deference is given to the findings and legal determinations of the trial judge unless "they are `manifestly unsupported by or inconsistent with competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Perez v. Monmouth Cable Vision, 278 N.J. Super. 275, 282, 650 A.2d 1025 (App.Div. 1994) (quoting Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974)).
While we are obliged to accord substantial deference to the judge's findings in light of his expertise, we are duty-bound to intervene if, upon a thorough review of the record, we harbor a definitive conviction the result reached was so wide of the mark a mistake must have been made. See State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). "This sense of `wrongness' can arise in numerous ways  from manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, a clearly unjust result, and many others." Ibid.
Here, the Judge of Compensation looked to the holding in Hellwig v. J.F. Rast & Co., Inc., 110 N.J. 37, 51, 538 A.2d 1243 (1988). He considered whether petitioner's condition was caused by petitioner's ordinary or routine work effort, and whether the effort exceeded the wear and tear of the petitioner's daily activities outside of the work place. This being a case involving occupational exposure rather than a cardiovascular accident of heart attack, Fiore v. Consol. Freightways, supra, is the authority that is technically more applicable.
We do not find it significant that the medical testimony demonstrates that cardiomyopathy, being a disease of the heart muscle only, is not considered a cardiovascular disease for medical or diagnostic purposes. We are satisfied that, since the Legislature intended Sections 7.2 and 31 to be remedial in nature, they require *262 that the issue of whether the disease is compensable be measured against the standards prescribed for cardiovascular causes. See N.J.S.A. 34:15-7.2 and 31. These enactments were meant to prevent recovery for cardiac claims that merely happen to manifest themselves in the workplace, and to ensure that employers are only held liable for cardiovascular conditions caused by occupational factors. See Fiore, supra, 140 N.J. at 467-71, 659 A.2d 436.
It is beyond question in this case that petitioner's cardiomyopathy was as a result of unknown causes unrelated to the employment. Therefore, it was petitioner's burden to show that the cardiomyopathy was significantly aggravated by the employment considering the totality of all the occupational factors and the nature of the disease. Id. at 471, 659 A.2d 436. Petitioner has failed in this regard and, in fact, has failed to prove any material aggravation or acceleration of the cardiomyopathy under the enhanced standards required by Fiore. Id. at 472, 659 A.2d 436.
Fiore held that "a petitioner claiming an occupational heart disease must show causes or conditions characteristic to the occupation or place of employment that substantially contributed in a material way to the disease." Id. at 472, 659 A.2d 436. [Emphasis added.] The Court, therefore, established three requirements that a petitioner making a claim for occupational heart disease must satisfy. The requirements are:
First, as section 31 provides, the petitioner must show that the disease is due in "a material degree" to causes "arising out of the workplace and that are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment."
Second, the petitioner must prove "by suitable medical evidence that the employment exposure did indeed cause or contribute to the disease  especially in the light of the competing claim of the smoking to be the causal agent." We doubt that the Legislature, when enacting section 7.2, contemplated that employers should compensate employees for coronary disease caused substantially by a lifetime of smoking or other personal-risk factors and immaterially by occupational exposure. Thus, a petitioner asserting an occupational heart-disease claim must show that the work exposure exceeds the exposure caused by the petitioner's personal-risk factors.

*263 Third, the petitioner must show that the employment exposure substantially contributed to the development of the disease. An occupational exposure substantially contributes to the development of coronary-artery disease when the exposure is so significant that, without the exposure, the disease would not have developed to the extent that it caused the disability resulting in the claimant's incapacity to work.
[Id. at 472-73, 659 A.2d 436 (citations omitted)].
The Fiore court left us with the following admonition:
The "material degree" standard requires courts to evaluate carefully an expert witness's conclusion "in the context of both the statutory criteria and prevailing medical standards." Hellwig, supra, 110 N.J. at 54, 538 A.2d 1243. The evaluation should
take into account the worker's medical history, the intensity and duration of the precipitating work effort, and the time interval between the work effort and the evidence of heart dysfunction. Compensation judges should be particularly skeptical of expert testimony that supports or contests a finding of causation on the basis of reasoning inconsistent with prevailing medical standards.
[Ibid.]

See Walck v. Johns-Manville Prods. Corp., 56 N.J. 533, 556, 267 A.2d 508 (1970) (reasoning under prior section 7.2 that "material degree" means that a heart attack "must be due in some realistic sense and material degree to a risk reasonably incidental to the employment, the attack must issue from or be contributed to by conditions which bear some essential relation to the work or its nature"); cf. Goyden v. Judiciary, Superior Court, 256 N.J. Super. 438, 458, 607 A.2d 651 (1991) (stating that "[t]he question is whether objectively verified stressful work conditions found in this case were established which were `peculiar' to the workplace and which justified the medical opinion that they were the `material' causes of [worker's depression]"), aff'd per curiam, 128 N.J. 54, 607 A.2d 622 (1992).
[Id. at 474-75, 659 A.2d 436.]
The evidence clearly showed that petitioner had a progressive disease of the heart muscle known as idiopathic cardiomyopathy, the cause of which was not ascertainable by medical or scientific knowledge. It was not proven to be aggravated by the employment either by reason of physical exertion or emotional stress and strain. All petitioner succeeded in proving was that because of his cardiomyopathy, the stressful job of Superintendent of Schools was beyond his capacity. This is insufficient.
He was advised by his treating physicians that there was danger in his continuing in the Superintendent position with the cardiac disease which he had. In this regard, while his functional loss in terms of the capacity of his heart to pump blood was *264 minimal, neither his personal physician nor the school board's physician could assure him that the disease would not progress. In their opinion it might be deleterious and perhaps even fatal if he continued under the stressful conditions of that job. All agreed, however, he could work under less stressful conditions.
The evidence reveals that petitioner's heart was probably not enlarged at the time the condition was discovered when he left employment, that he had a normal cardiogram (except for changes brought about because of the digitalis used for treatment of his diabetes), that his blood pressure was normal when not on the job, and that his cardiovascular system remained normal. The evidence is in agreement that there was little, if any, hypertrophy or dilation of the heart chambers and that petitioner was not in congestive heart failure at any time. The treating cardiologist, Dr. Pasquariello, made it clear in his report, prepared almost a year after petitioner left his employment with the board, that the "decrease in overall cardiac performance [is only] of a mild degree." This is in keeping with the hospital records made available to the experts.
Dr. Pasquariello cautioned, however, that the nature of the disease is that it tends to be progressive and thus petitioner was advised it was appropriate to retire. Dr. Pasquariello felt that physical and emotional stress "may adversely affect the outcome and prognosis of any individual with a depressed left heart function." Further, this treating cardiologist found no obvious progression since the original diagnosis. There is nothing in the report of Dr. Pasquariello, upon which the Judge of Compensation relied, to indicate or raise an inference that there was any aggravation or acceleration of the cardiomyopathy from which petitioner suffered.
The mere fact that stressful conditions at work may bring out the symptoms of an underlying condition does not compel the conclusion that it has either caused, aggravated or accelerated the disease. It is particularly significant on this issue that Dr. Rothfeld, who had seen over one thousand cases of cardiomyopathy, *265 reported that he had "never seen one without hypertrophy or dilation." He saw no evidence of either in the invasive tests administered, and therefore, concluded this was "a very, very early case." He reasoned that he probably had never seen such a case before because patients with "idiopathic cardiomyopathy [who] had neither hypertrophy or dilation don't get to the doctor." In this case because of the stressful nature of the workplace, petitioner did, in fact, have symptoms in these early stages of his idiopathic cardiomyopathy and he fortunately saw a doctor.
It is also significant that without the aid of the catheterization and MUGA, there was no clinical evidence whatsoever from which the diagnosis of cardiomyopathy could be made in this individual. Because he did not have hypertrophy, dilation or heart failure and had no coronary artery heart disease, petitioner's condition was undiagnosable without the invasive procedures employed. Dr. Rothfeld produced the chest x-rays he had taken of the petitioner and stressed that it is highly unusual for a patient with idiopathic cardiomyopathy not to have an enlarged heart. He believed it was important to point that out to show that the natural progression of the disease had not taken place as there was no enlargement of the heart.
This is not a case of experts differing over whether or not the severity of a disease was attributable to natural progression, as opposed to aggravation or acceleration caused by occupational exposure. There was just no evidence here of anything other than a disease in its very early stages with only minimal consequences in terms of decreased heart function. Although the disease was described as mild and in its early stages, it cannot be denied that the consequence to this individual, who could no longer carry out the stressful duties of his job as Superintendent of Schools, was significant. However, as we have spelled out above, it is the petitioner's burden to show by suitable medical evidence that the job stress substantially contributed to the condition or disease that developed, and that without the exposure, it would not have developed to the extent that it caused the disability manifested.
*266 We fail to find any evidence explaining or demonstrating how and to what extent petitioner's cardiomyopathy was aggravated, particularly when it was shown to be so mild and at such an early stage. The mere showing of an inability to continue the stressful job of Superintendent cannot act as a substitute for the proof required under Fiore. In summary, even if the Judge accepted the petitioner's experts' theories that idiopathic cardiomyopathy can be aggravated by stress, there was no proof of any aggravation of that condition with respect to this petitioner.
Turning next to the award for psychiatric disability, we first note that petitioner has indicated that since he is no longer in the stressful environment of Superintendent, he is doing well and feeling fine. Assuming petitioner had adequately demonstrated that some psychiatric treatment and disability was due to the stress of the employment, either with regard to specific events or the chronic nature of the stress, there would be no basis for an award for permanent disability as the removal from the source of the stress relieved petitioner of that part of his disability at least. N.J.S.A. 34:15-36 permits awards for permanent disability only "where no fundamental or marked improvement in such condition can be reasonably expected." We can understand that someone with such problems might not recognize their ailment, however, this petitioner seemed particularly insightful regarding his emotional problem and sought treatment when he felt he needed it.
In any event, one who discovers that because of idiopathic disease he can no longer continue in a position he enjoys, and who suffers anxiety and depression because of that consequence and the seriousness of the disease, is not entitled to recover for the psychiatric consequences brought on by those circumstances unless the disease is related to the employment. Thus, in large measure, the underpinning that would be necessary for this petitioner to recover for any psychiatric disability is that the cardiac disability is related to the employment. Petitioner has not shown that the cardiac disability is related and, therefore, that portion of *267 the psychiatric disability which is directly related to the cardiac condition cannot be found to be compensable.
Moreover, even putting aside the causation issue, we find no sound basis for the Judge of Compensation to have granted an award of 85% of total partial permanent disability in this case. The Judge accepted the entire estimates of disability given by petitioner's experts noting that the respondent's experts failed to give any estimates of partial permanent disability. In accepting the 50% of partial total psychiatric disability estimate of petitioner's expert, the judge inexplicably stated "I feel this number is consistent with Petitioner's complaints and treatment and his inability to return to his chosen field of work." [emphasis added.] While we cannot see how any possible residual psychiatric disability could approach the 50% of partial total estimated by petitioner's expert, or how the mild impairment which the treating cardiologist and objective tests found to cause minimal interference with heart function translated into 35% of partial total cardiac disability, we add that if the Judge felt the figures given by petitioner's experts were justified, it was his obligation to specifically place upon the record a rational justification for such a conclusion.
We, therefore, reverse the judgment granting petitioner an award for permanent cardiac and psychiatric disability and direct the Judge of Compensation to dismiss petitioner's Claim Petition.