809 A.2d 167

PAULINE FELTMAN, PETITIONER–APPELLANT, v. TRANSISTOR DEVICES, INC., RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 8, 2002—Decided November 12, 2002.

38

Before Judges STERN [1], COLLESTER and ALLEY.

*James J. Mahoney* argued the cause for appellant.

*Daniel A. Lynn* argued the cause for respondent (*Braff, Harris and Sukoneck,* attorneys; *Christopher A. Diaz,* on the brief).

The opinion of the court was delivered by

ALLEY, J.A.D.

Pauline Feltman filed a dependency claim in October 1996 based on her husband Stanley Feltman's death in December 1994. Feltman's employer, Transistor Devices, Inc., filed an answer to Mrs. Feltman's claim in January 1997. Following a hearing held between March 2000, and January 2001, a judge of compensation dismissed her claim on May 29, 2001. The judge of compensation set forth his reasons in a written decision dated May 9, 2001. Petitioner appeals from the dismissal, and we affirm.

## I

The evidence at the hearing included the following. Stanley Feltman worked as a vice president for respondent Transistor Devices, Inc., of Cedar Knolls, New Jersey (Transistor). According to his death certificate, he died of a myocardial infarction at his home on December 16, 1994. His heart attack occurred within hours of his return from a business trip he took for respondent to Lockheed Aircraft Services in Ontario, California.

Pauline Feltman of West Milford, New Jersey, Feltman's widow, petitioned the Division of Workers' Compensation of the State of New Jersey Department of Labor in October 1996. Her claim petition alleged that her husband's fatal myocardial infarction arose out of and in the course of his employment with Transistor.

---

[1] Judge Stern did not participate in oral argument, but has, with the consent of counsel, been added to the panel deciding the matter.

Feltman, a designer of power tools, became a vice president of Transistor when it acquired his company, ACDeCo, in 1983. He continued as vice president of power supplies—managing people, designing tools, executing designs, and meeting with investors and customers. Transistor's CEO called Feltman's job a "desk job" and described him as a talented electrical engineer. Feltman traveled overnight about once a year on business.

Beginning in December 1993, Feltman worked primarily to establish Transistor as a subcontractor to Lockheed. Transistor would design hardware to be used in planes Lockheed hoped to produce for the Air Force. Lockheed had been awarded the engineering phase of the Air Force contract and hoped to win the production portion, which would amount to eighty-five million dollars or more for Lockheed. During the summer of 1994, Transistor won the first of six potential one-year option contracts with Lockheed. This first contract represented a net profit of two million dollars for Transistor, which stood to gain up to thirty million dollars if retained as a contractor throughout the project.

Feltman was responsible for Transistor's bid and for negotiations with Lockheed. According to petitioner, the project could be described as Feltman's "baby." During his last year, he worked weekends and overtime on this matter, or about fifty to sixty hours a week according to his co-worker Kathleen Thornton.

The parties dispute the extent to which a potential award of subsequent contracts hinged on the December 1994 meetings at Lockheed. Feltman traveled to Ontario, California as Transistor's principal representative, accompanied by Thornton. Lockheed needed to be assured that Transistor's components would meet Air Force specifications. Some changes needed to be made in Transistor's designs, and this conference included a technical review of such issues. Thornton maintained the trip was "routine," explaining that representatives from the Air Force, from Lockheed, and from the major subcontractors had to review the aircraft plans.

The agenda for Feltman's business trip covered scheduled meetings for December 13 and 14, 1994. Twelve of the twenty-two meetings were scheduled on the first day, the remaining ten for the second day. Each day's schedule provided for a fifteen minute hospitality session beginning at 8:00 a.m., an hour lunch, and two fifteen minute breaks. The days were set to end at 3:15 p.m. and 4:00 p.m. respectively. The agenda listed Feltman, along with two engineers from other companies, as responsible for presenting an hour and five minute segment on December 14.

According to Thornton, on December 12, she and Feltman took a three-hour flight to St. Louis, flew four hours from there to California, rented a car, placed a call to their home office, and shared dinner and discussion about the meetings planned for the thirteenth.

The thirteenth marked the first day of meetings, which constituted a "preliminary design review." Feltman worked all day, through lunch, and became involved in each meeting. He also gave a presentation for between thirty and forty minutes about an electrical upgrade he planned to implement. Following wrap-up meetings with Lockheed staff, Feltman drove Thornton on a tour of Los Angeles, to the raceway, and to dinner.

Instead of leaving as planned on the fourteenth, Feltman learned he had to stay an additional day. Because Thornton left on the morning of the fourteenth, she reconstructed Feltman's day from a conversation she had with him during his flight-layover on the fifteenth. He gave, or helped to give, a total of four technical presentations. In their phone conversation, Feltman reported disagreements with a Lockheed engineer about how design changes should be made and expressed pleasure that each had been resolved in his favor. Thornton called these disagreements "typical," noted nothing unusual about Feltman's conduct during the trip, and indicated that while meetings had been argumentative at times, they had not been inordinately so.

Mrs. Feltman alone told of Feltman's last hours. He drove himself from the airport, arriving home before 9:00 p.m. He told

his wife he was glad to be home but was not feeling well. He relaxed a little, ate some fruit, and reviewed material from the conference. He went to bed at approximately 11:00 p.m., but it is unknown whether he fell asleep. Mrs. Feltman awoke as her husband stood up beside their bed and silently fell backward. She called "911" for emergency assistance but the police and rescue squad were unable to revive him.

When Feltman died he was sixty-three years old. His wife testified that he had had no blood pressure problems although respondent disputed this. No one alleged he had smoked since quitting in 1983. All agreed he carried considerable weight on his six-foot four-and-one-half inch frame. Estimates of his weight ranged from three to four hundred pounds. Both doctors termed him "morbidly obese," a state carrying health risks of its own.

There was no doubt that Feltman lived a sedentary life. His wife noted he had no hobbies and engaged in no exercise. Thornton remembered him looking like a "couch potato." Leisure activities for Feltman included enjoying his stereo and his dogs, reading, watching television, and using the computer.

Thornton recalled Feltman saying he had not felt well following a vacation he had taken several weeks earlier. Mrs. Feltman, however, recalled that he had felt relaxed during that vacation and immediately thereafter. Directly before his trip to California, Feltman told his wife he did not feel like going. He explained he did not feel well, was tired, and his legs bothered him. Mrs. Feltman felt that he was under emotional stress from missing out on a bonus in November, negotiating with Lockheed, and anticipating design changes which could flow from the conference. She reported that he told her he was not feeling well while in California, regretted having to stay an extra day, and was anxious to return home.

Two experts testified as to the probable causes for Feltman's death. There had been no autopsy, and as a result, each expert concentrated on the paper record. Dr. Bernard Eisenstein testi-

fied for petitioner as an expert in cardiology, and Dr. Joel Duberstein testified for respondent as an expert.

Eisenstein gave two possible causes of death, a myocardial infarction or, alternately, a pulmonary embolus caused by a deep venous thrombosis. Eisenstein opined that the "great stress" Feltman was under contributed "[i]n a material way[]" to a fatal myocardial infarction. According to Eisenstein, this stress included the amount of money involved in the Lockheed contract, the responsibility of being the one in charge, long work hours, three days in California involving "very heavy stress and arguments[,]" and an unexpected additional day in California. He also acknowledged the "material" contribution of stress Feltman had experienced in the "weeks and days and hours before" his death. Eisenstein also considered that a heated argument during the conference and Feltman's sedentary lifestyle could have contributed to his death.

Eisenstein's second theory, that a deep venous thrombosis caused a fatal pulmonary embolus, presupposed Feltman's confinement in plane seats for a total of fourteen hours during the trip. For Eisenstein, this amounted to sufficient "prolonged immobilization" to have caused Feltman's death. Eisenstein held to his theory even when it was pointed out Feltman traveled in first class and had a stopover. Because this immobilization resulted from "necessary flights" Eisenstein opined that this also constituted a "work-related" cause of death. Eisenstein testified that both of his theories were likely by a reasonable medical probability, which he defined to be "certainly more than 50%."

Duberstein brought out certain facts not otherwise in the record to suggest Feltman had a history of variably high blood pressure and elevated cholesterol levels. This data apparently appeared in records from Feltman's regular medical examinations. (No record of these exams appears elsewhere in the trial record.) He concluded Feltman died from a myocardial infarction which resulted from the natural progression of his existing health conditions. Duberstein was of the opinion that Feltman tolerated stress well.

On cross-examination, Duberstein admitted not knowing the potential value of Lockheed's contract, that the project had been like a "baby" to Feltman, that Feltman had been turned down for a bonus before traveling, or that Feltman addressed members of the Air Force when he presented to Lockheed.

In his opinion, the judge of compensation began by first finding that two sections of the Worker's Compensation Act, *N.J.S.A.* 34:15–1 to –69.3, applied to Feltman's case because "no specific day or event" was shown to be the cause of Feltman's death. Specifically, he found that petitioner had to satisfy both *N.J.S.A.* 34:15–7.2, relating to deaths resulting from cardiovascular causes, and *N.J.S.A.* 34:15–31, relating to occupational disease claims.

The judge of compensation then focused on section 7.2, explaining how the law in that area had changed. Under the former standard, represented by *Dwyer v. Ford Motor Co.*, 36 *N.J.* 487, 178 *A.*2d 161 (1962), a petitioner need only prove that work effort or strain "contributed in some material degree to the precipitation, aggravation or acceleration of the existing heart disease and the death therefrom." *Id.* at 493, 178 *A.*2d 161. This standard was, the judge of compensation noted, superseded by the 1979 amendments to the Workers Compensation Act, so that in a heart attack death case "[s]ection 7.2 of the act now requires the work effort or strain to involve 'a substantial condition, event or happening ... [which] in reasonable medical probability caused in a material degree the cardiovascular ... death resulting therefrom.'" We address this development in the law in detail below.

The judge of compensation dismissed petitioner's claim, concluding she had not proved by a preponderance of evidence that Feltman's death met the new standard. He concluded that petitioner's allegation that work stress had caused Feltman's heart attack was unsupported because testimony at trial showed that Feltman handled stress well. Feltman did not "permit the stress of his job to have any lasting effect on him." More importantly, Feltman's symptoms "first manifested themselves several weeks before his California meetings," when he complained to his wife,

and significantly, did not worsen during the trip. In addition, any stress that Feltman experienced during his California meetings was short-lived because it ended "when the meetings ended."

The judge of compensation also detailed his reasons for accepting Duberstein's opinion and rejecting Eisenstein's opinion. He found that while Duberstein had made certain mistakes as to facts, they "d[id] not affect his rationale[.]" He categorized Eisenstein's testimony as a net opinion and at odds with the credible evidence. In part, the judge of compensation reached this conclusion because he concluded that Eisenstein had relied upon many facts not in evidence. For example, he decided Eisenstein incorrectly assessed the "intensity and duration of the stress" Feltman experienced. In this regard, he found Feltman had "not experienced[d] the quantum of stress ... necessary to cause his fatal myocardial infarction[.]" With regard to Eisenstein's deep venous thrombosis hypothesis, for example, the judge of compensation decided Eisenstein had been wrong about the extent to which Feltman had experienced prolonged immobilization.

Lastly, the judge of compensation considered Feltman's risk factors for heart disease: age, high blood pressure, and morbid obesity. He used these factors to support his finding that the natural progression of his coronary heart disease, rather than work stresses, caused Feltman's death.

## II

We preface our discussion of the legal principles that govern this case by reviewing the development of New Jersey law, *see* the Workers Compensation Act, *N.J.S.A.* 34:15–31 and the Act's 1979 amendment, *N.J.S.A.* 34:15–7.2, as these developments are summarized by the Court in *Hellwig v. J.F. Rast & Co., Inc.*, 110 *N.J.* 37, 538 *A.*2d 1243 (1988) and *Fiore v. Consolidated Freightways*, 140 *N.J.* 452, 659 *A.*2d 436 (1995).

In *Hellwig*, Justice Stein described the background behind *N.J.S.A.* 34:15–7.2. He noted that section 7.2 was enacted against the backdrop of a trilogy of worker's compensation cases involving

coronary disease: *Seiken v. Todd Dry Dock, Inc.*, 2 *N.J.* 469, 67 *A.*2d 131 (1949); *Ciuba v. Irvington Varnish & Insulator Co.*, 27 *N.J.* 127, 141 *A.*2d 761 (1958); and *Dwyer v. Ford Motor Co.*, 36 *N.J.* 487, 178 *A.*2d 161 (1962). *Hellwig, supra,* 110 *N.J.* at 42, 538 *A.*2d 1243.

*Seiken* held that the presumption was that "injury or death from heart disease is the result of natural physiological causes." *Seiken, supra,* 2 *N.J.* at 475, 67 *A.*2d 131. In order for a claimant to prove that the employment was a contributing factor, the Court held that

something of an unusual strain or exertion beyond the mere employment itself is required to establish liability; the mere showing that the claimant was performing his routine, everyday tasks, when he suffered a heart attack does not establish a right to workmen's compensation.

[*Id.* at 476, 67 *A.*2d 131.]

In 1958, *Seiken* was reversed by *Ciuba,* which concluded that a compensable accident occurred

where a heart ravaged by disease succumbs to strain or exertion arising from the doing of the master's work, even though it be but a normal incident of the service, in no sense extraordinary, and such as a sound heart could withstand. It is basic to the statutory policy that, if strain or exertion attending the rendition of the service aggravates or accelerates the progress of a pre-existing physical infirmity or condition due to either trauma or disease, and disability or death ensues, there is a compensable accident and injury. Such is an untoward event, unintended and unexpected within the concept of the statute. The essential inquiry is whether the disabling injury or death is causally related to strain or exertion attendant on the doing of the master's work.

[*Ciuba, supra,* 27 *N.J.* at 134–35, 141 *A.*2d 761.]

Although *Ciuba* overruled *Seiken, Ciuba* reaffirmed the validity of the presumption that "injury or death from heart disease is the result of natural physiological causes." *Id.* at 138, 141 *A.*2d 761. But *Ciuba* also held that

[t]he essential question is whether strain or exertion incident to the work accelerated the worker's death. Would his death have occurred when it did if it had not been for the work in which he was engaged? Presumably, he had suffered from heart and arterial insufficiency. There was evidence of lowered stamina for a year before the mortal seizure; but the inference is well-nigh irresistible that physical exertion attending the doing of the work aggravated his disease and weakness of heart and brought on the fatal collapse. The evidence fairly excludes the hypothesis of death as the consequence of disease alone.

True, the occlusion and the exertion may have been a co-incidence. But the exertion could have precipitated the occlusion to which the decedent was predisposed by disease; and that such was the case is the probable or more probable hypothesis with reference to the possibility of other hypotheses. Indeed, the existence of a causal relation in these circumstances would seem to be well grounded in common knowledge and experience.

[*Ciuba, supra*, 27 *N.J.* at 140, 141 *A.*2d 761.]

In *Dwyer v. Ford Motor Co.*, 36 *N.J.* 487, 178 *A.*2d 161 (1962), "the precise issue raised was the quality of proof that was necessary to establish that the employee's death from coronary disease was work-related to a material degree." *Hellwig, supra*, 110 *N.J.* at 44, 538 *A.*2d 1243. The Court held that the analysis should focus on the "total or cumulative effect of the work effort, and not on any single act or any single exertion beyond that usually associated with the work. . . ." *Dwyer, supra*, 36 *N.J.* at 509, 178 *A.*2d 161.

*Hellwig* noted that *Dwyer* was the "most recent of the critical trilogy of heart disease cases, and was of special significance because it was targeted by the Joint Statement to the Senate and Assembly Committee Substitute Bills that resulted in the enactment of *N.J.S.A.* 34:15–7.2." *Hellwig, supra*, 110 *N.J.* at 44, 538 *A.*2d 1243. Thus, *Hellwig* pointed out:

Reference to two other observations by the *Dwyer* Court is essential to a full under-standing of the 1979 amendment. First, in describing the work effort required to establish causation, the Court observed that

[b]enefits are not lost because the amount of the work stress was such that it might or could be duplicated in routine activity about the home or in customary movements or effort while there.

[*Dwyer, supra*, 36 *N.J.* at 492, 178 *A.*2d 161.]

Secondly, the standard for determining the quantum of proof required to establish causation was described as follows:

Such claimant has the burden of showing by the preponderance of the believable evidence that the ordinary work effort or strain in reasonable probability contributed in some material degree to the precipitation, aggravation or acceleration of the existing heart disease and the death therefrom. In this context, the significance of "some material degree" cannot be stated with mathematical precision. It means an appreciable degree; a degree greater than *de minimis* ∗ ∗ ∗.

[*Id.* at 493, 538 *A.*2d 1243.]

[*Hellwig, supra*, 110 *N.J.* at 47–48, 538 *A.*2d 1243.]

Section 7.2 was adopted by the Legislature to counter *Dwyer*. The legislative history expressly stated that the legislation was intended to

[counter] the far-reaching effects of *Dwyer v. Ford* in cardiac claims by requiring that a petitioner prove that the injury or death involved substantial effort or strain which was in excess of the rigors of the claimant's daily living and that the cause of the injury or death was job-related in a material degree.

[Joint Statement to Senate Committee Substitute for Senate, No. 802 and Assembly Committee Substitute for Assembly, No. 840.]

Section 7.2 provides in part:

[T]he claimant shall prove by a preponderance of the credible evidence that the injury or death was produced by the work effort or strain involving a substantial condition, event or happening in excess of the wear and tear of the claimant's daily living and in reasonable medical probability caused in a material degree the cardiovascular or cerebral vascular injury or death resulting therefrom.

Material degree means an appreciable degree or a degree substantially greater than de minimis.

*Hellwig* explained that section 7.2 modified *Dwyer* by mandating that the work effort must be in excess of the "wear and tear of the claimant's daily living," in contrast to *Dwyer's* holding that a compensable injury occurred even if the work stress "could be duplicated in routine activity about the home." *Hellwig, supra,* 110 *N.J.* at 48, 538 *A.*2d 1243.

Section 7.2 also redefined the proof required to establish a claim. *Id.* at 49, 538 *A.*2d 1243. *Dwyer* required that the work effort contribute in a material degree to the heart disease but defined material degree to mean only "an appreciable degree; a degree greater than de minimis...." *Dwyer, supra,* 36 *N.J.* at 493, 178 *A.*2d 161. Section 7.2 redefined material degree to mean "an appreciable degree or a degree substantially greater than de minimis." *N.J.S.A.* 34:15–7.2. *Hellwig, supra,* 110 *N.J.* at 49, 538 *A.*2d 1243.

Lastly, *Hellwig* noted that section 7.2 required that the work effort "in reasonable medical probability" caused the cardiovascular injury or death. *Id.* at 49, 538 *A.*2d 1243. In contrast, *Dwyer* did not require a claimant to make such a showing. Thus, *Hellwig* observed that in enacting section 7.2, the Legislature "plainly

intended to change the quality of proof necessary to establish that a coronary incident is work-related." *Ibid.*

In deciding *Hellwig,* the Court rejected the position that a claimant in a heart attack case must show that "the precipitating work effort in cardiovascular claim cases must be compared with both the worker's daily home activity and ordinary work effort to support a conclusion that the injury or death was caused in a material degree by the work effort." *Id.* at 39, 538 A.2d 1243. Instead, the Court affirmed our conclusion in *Hellwig,* 215 *N.J.Super.* 247, 521 A.2d 896 (App.Div.1987), that "the statutory phrase 'in excess of the wear and tear of claimant's daily living' was intended to insure that the critical work effort was more strenuous than claimant's daily activities 'exclusive of work.'" *Ibid.*

*Fiore v. Consolidated Freightways, supra,* involved a truck driver who claimed that he had sustained an angina attack as a result of occupational exposure to carbon monoxide fumes. Both the judge of compensation and the Appellate Division applied section 7.2 to Fiore's claim. The Supreme Court, however, concluded that *N.J.S.A.* 34:15–31 was the proper statutory section. *Fiore, supra* 140 *N.J.* at 472–73, 659 A.2d 436. Section 31, which deals with occupational diseases, defines a "compensable occupational disease" to "include all diseases arising out of and in the course of employment, which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment."

Writing for the Court, Justice Pollock acknowledged that the language in section 7.2 seemingly applied to Fiore, but ultimately determined that section 31 was more appropriate because Fiore's claim involved an occupational disease (exposure to carbon monoxide) which had caused coronary artery disease. In contrast, because the Legislature enacted section 7.2 to address *Dwyer's* elimination of the presumption that a heart attack is the result of natural causes, section 7.2 addressed cardiac incidents that happened to occur in the work place. *Id.* at 467, 659 A.2d 436.

Section 7.2 was less applicable to Fiore because the substance of his claim did not involve such a cardiac incident. As the Court noted: "The subject claim, which relates to occupational exposure to carbon monoxide arising out, and in the course, of Fiore's employment, focuses on Fiore's working conditions. From our perspective, section 31 more readily fits that claim." *Id.* at 470, 659 *A.*2d 436.

Recognizing that section 7.2 imposed a more stringent standard upon claimants seeking to recover for coronary disease injuries, however, the Court concluded that an equally enhanced standard should apply to a cardiovascular claim arising under section 31. The Court held:

We conclude generally that an employee claiming an occupational heart disease must show that the disease is due in a material degree to causes or conditions that characterize the employee's occupation and that substantially contribute to the development of the disease.

[*Id.* at 459, 659 *A.*2d 436.]

*Hellwig* and *Fiore* thus both indicate that the Legislature and the courts have been concerned with the compensability of injuries occurring from cardiovascular disease, and accordingly have held such claims to a heightened standard of proof.

■ Turning to petitioner's claim, we note first that the judge of compensation concluded that petitioner had to satisfy both section 7.2 and section 31, because "no specific day or event" caused Feltman's death. We are unsure as to the source of this "one day or event" standard. In any event, we disagree because the record quite plainly indicates that Feltman's death was the result of the heart attack he sustained on December 16, 1994. In our view, it is clear that petitioner's claim falls under section 7.2 because she seeks compensation for Feltman's "death from cardiovascular ... cause[] ..." *N.J.S.A.* 34:15–7.2.

■ Section 31 thus bears little relevance here because, unlike the claimant in *Fiore*, petitioner does not allege that Feltman's heart attack was the result of occupational exposure or disease. Indeed, petitioner expressly contends that it was error to apply

here the standards for occupational disease claims under section 31.

■ We are satisfied, however, that the judge of compensation's erroneous conclusion was harmless. This is because, although he began by stating that both sections 7.2 and 31 applied, he then only discussed petitioner's claim within the context of section 7.2. We thus construe the judge of compensation's decision to ultimately require that petitioner satisfy only the requirements of section 7.2, not both sections 7.2 and 31, and this application of the law was correct.

■ Under section 7.2 of the Act, petitioner had to establish that (1) Feltman's fatal episode was "produced by the work effort or strain involving a substantial condition, event or happening," (2) the work effort or strain was greater than "the wear and tear of [Feltman's] daily living," and (3) the work strain "in reasonable medical probability caused" the heart attack "in a material degree." The burden of proof rests upon the petitioner, who must prove "a probable or a more probable hypothesis...." *Laffey v. City of Jersey City,* 289 *N.J.Super.* 292, 303, 673 *A.*2d 838 (App. Div.), *certif. denied,* 146 *N.J.* 500, 683 *A.*2d 202 (1996) (citations omitted). Moreover, as the judge of compensation noted, the presumption is that the heart attack is the result of natural causes. *See Fiore, supra,* 140 *N.J.* at 467–68, 659 *A.*2d 436 (stating that section 7.2 reinstated presumption that heart attack is result of natural causes).

■ Under the standards set forth in *Close v. Kordulak Brothers,* 44 *N.J.* 589, 210 *A.*2d 753 (1965), we should not disturb the judge of compensation's findings, provided they:

"could reasonably have been reached on sufficient credible evidence present in the record," considering "the proofs as a whole," with due regard to the opportunity of the one who heard the witnesses to judge of their credibility [and] ... with due regard also to the agency's expertise where such expertise is a pertinent factor. [*Id.* at 599, 210 *A.*2d 753.]

The judge of compensation first determined that Feltman's heart attack was not caused by work effort or strain involving a

substantial condition or event. He concluded that the stress experienced by Feltman during his California trip was not a substantial event because: (1) Feltman handled stress well, as evidenced by his ability to relax in California after the day-long meetings; (2) Feltman's symptoms of discomfort first manifested themselves several weeks before his trip; and (3) he did not complain of any cardiac symptoms during his business trip.

■ Thornton's testimony provided credible evidence to support the judge's conclusions. First, Thornton reported no apparent decline in Feltman's health during the trip. Second, he conducted himself normally throughout the trip. Third, Feltman told Thornton during their December 15 telephone conversation that he was pleased with the outcome of the meetings in California. Thornton's testimony, combined with Duberstein's opinion and with the earlier manifestations of the symptoms of discomfort, support the finding that Feltman's trip to California failed to constitute "a substantial condition, event or happening" in the context of *N.J.S.A.* 34:15–7.2.

■ With respect to section 7.2's second requirement that the work effort or strain be greater than "the wear and tear of the claimant's daily living," the judge of compensation accepted petitioner's claim that Feltman's work activity was more strenuous than his ordinary life pursuits. He then found, however, that petitioner had failed to meet the third requirement, that in reasonable medical probability, the work strain materially caused the heart attack. Because of Feltman's own risk factors of age, high blood pressure, and morbid obesity, he concluded that the heart attack was the result of the natural progression of Feltman's coronary artery disease.

These findings were plainly based on credible evidence in the record below. It was uncontroverted that Feltman was morbidly obese, and his health records indicated that he had suffered from high blood pressure. There was no evidence to suggest that Feltman had engaged in either a course of treatment or a change in lifestyle that might have lowered that pressure. Respondent's

expert, Duberstein, explained that obesity, hypertension and being of the male sex, were all risk factors for a myocardial infarction. Duberstein further opined that Feltman's heart attack had been caused by the natural progression of coronary artery disease.

Nonetheless, petitioner contends that the decision appealed from was erroneous. First, petitioner submits that because the judge of compensation acknowledged that petitioner had "satisfied the *Hellwig* requirement and proved that Mr. Feltman's work activity was more strenuous than his ordinary life pursuits," petitioner thereby overcame the presumption that the heart attack arose from natural causes.

We are unable to agree. Feltman's sedentary existence and lifestyle outside of work are undisputed. It is not clear, however, that his lifestyle outside of work did not indeed cause his heart attack. A lesser degree of strain outside of the workplace does not necessarily compel the conclusion that such a lifestyle, in the absence of work stresses, would not in any event lead to death from coronary problems.

Moreover, petitioner mistakes the law in contending that the judge of compensation required her not only to prove that her claim conformed with the principles of *Hellwig*, but also to prove that Feltman's trip and the circumstances of the trip caused his death, not the circumstances of his non-working life. As we have noted, the judge of compensation specifically found that petitioner had satisfied the *Hellwig* test that Feltman's "work activity was more strenuous than his ordinary life pursuits[.]" But to require her to also prove that the work activity was causative within the analytical framework discussed in *Hellwig* and *Fiore* is not to require her to prove her claim twice. Rather, petitioner still must meet the other requirements imposed by section 7.2, namely that the work effort, even where the work activity has been determined to be more strenuous than ordinary life activity, caused the injury or death. It would be illogical to conclude that a finding favorable to the petitioner on the first issue is necessarily dispositive of the second issue.

Finally, we address petitioner's contentions that the judge of compensation used "unsupported medical musings" to anchor his decision, citing *Lesniewski v. W.B. Furze Corp.*, 308 *N.J.Super.* 270, 705 *A.*2d 1243 (App.Div.1998). Petitioner in particular disputes the judge of compensation's acceptance of Duberstein's opinions and his rejection of Eisenstein's opinions.

A subtext in the judge of compensation's opinion seems to be an underlying reservation about the effect on Eisenstein's testimony of a hypothetical question which is not provided in the record. Additionally, during the hearing the judge of compensation warned, "This court ... will base its decision on the evidence and only on the evidence adduced at this trial. This is the doctors' understanding of the testimony. If ... he is not correct, I will refer to it in my decision[.]" A reading of Eisenstein's testimony demonstrates a real concern that Eisenstein's understanding of the facts may have been unduly colored by the hypothetical. Eisenstein stated he assumed all the facts in the hypothetical to be true and "depended a great deal on the hypothetical question." Yet, the hypothetical had been prepared before Eisenstein knew all the facts. Additionally, Eisenstein relied upon communications with Mrs. Feltman not in evidence, and noted that he "assumed everything in her correspondence to be true."

In the final analysis, the judge of compensation's discounting of Eisenstein's testimony is entitled to deference under *Close, supra,* which aims to prevent us from engaging in unwarranted second-guessing of the fact finder. The judge of compensation had the opportunity to hear testimony from both Eisenstein and Duberstein, and from the vantage of appellate review we see no basis to depart from his thoughtful decision to accept Dr. Duberstein's opinion and to place little reliance on that of Eisenstein. The decision is grounded in substantial evidence.

Affirmed.