SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**James P. Renner v. AT&T** **(A-71-11) (068744)**

**Argued January 6, 2014 – Decided July 30, 2014**

**RODRÍGUEZ, P.J.A.D. (temporarily assigned), writing for a unanimous Court.**

In this appeal, the Court considers the requirements for establishing a compensable claim for cardiovascular injury, disease or death, as defined by N.J.S.A. 34:15-7.2 of New Jersey's Workers' Compensation Law.

Cathleen Renner, an employee of defendant AT&T for approximately twenty-five years, died on September 25, 2007 as a result of a pulmonary embolism. At the time of her death, Cathleen had a telecommuting agreement with AT&T, which allowed her to work from her home office several days a week. On the evening of September 24, 2007, she worked from that office for several hours, and continued to work there through the next morning. Computer records confirmed that she sent an e-mail to a co-worker at 12:26 a.m. When Cathleen's son Jeffrey woke up at 7:00 a.m., he noticed that she was still working in her office. At about 7:50 a.m., she stopped to take him to catch his school bus. While they were walking out of the house, she grabbed her leg and indicated that she was in pain. At about 9:00 a.m., she told a co-worker that she was not feeling well, but would continue to work on the project. Cathleen sent several additional e-mails until she completed the project at 10:30 a.m.

Approximately one hour after the last e-mail, Cathleen called Emergency Medical Services (EMS). When they arrived at her home, they found her lying face down screaming, "I can't breathe. Help me! I'm choking!" Emergency resuscitative measures were unsuccessful and she was pronounced dead after her arrival at JFK Medical Center. According to her autopsy, Cathleen died of an embolism that had become lodged in her pulmonary artery.

James Renner, Cathleen's husband, filed a dependency claim in the Division of Workers' Compensation (Division) in which he alleged that her death was compensable as an occupational disease as defined by N.J.S.A. 34:15-31. The judge of compensation awarded him benefits, but the Appellate Division reversed, concluding that the judge had applied the incorrect standard to the facts presented. The Appellate Division remanded for the Division to determine whether dependency benefits could be awarded pursuant to the cardiovascular injury, disease or death, standard defined by N.J.S.A. 34:15-7.2.

On remand, Dr. Leon H. Waller, a board certified internal medicine physician, testified on plaintiff's behalf. Based on his review of the medical records and autopsy report, he found that Cathleen's work effort of sitting at her desk the day before and the day of her death contributed in a material degree to deep vein thrombosis (DVT) and her death. He opined, within a reasonable degree of medical probability, that the sedentary nature of her work was the precipitant in the pulmonary embolism, which resulted in her death. Dr. William S. Kritzberg, also board certified in internal medicine, testified for AT&T. While he agreed that Cathleen's ultimate cause of death was a pulmonary embolism, he found that she had several risk factors – morbid obesity, birth control pill use, age, enlarged heart – which contributed significantly to the embolism's formation. Dr. Kritzberg concluded that it was impossible to state within a reasonable degree of medical probability that her cause of death was related to her work effort. Ultimately, the judge accepted Dr. Waller's findings as more probable, concluded that Cathleen's death was a compensable event, and entered an order awarding dependency benefits.

AT&T appealed, arguing: 1) the evidence was insufficient to establish that her work for the company exceeded the wear and tear caused by her non-work activities; 2) the evidence was insufficient to establish that her work caused the embolism; and 3) the judge's findings were not supported by the evidence. The Appellate Division affirmed, agreeing that the claim was compensable pursuant to N.J.S.A. 34:15-7.2. This Court granted certification. 209 N.J. 233 (2011).

**HELD**: Where a Workers' Compensation claimant fails to demonstrate that cardiovascular injury, disease or death, resulted from a work effort or strain involving a substantial condition or event, he or she is not entitled to compensation under N.J.S.A. 34:15-7.2.

1.	The Court has a long history of analyzing cardiovascular or cerebral vascular Workers' Compensation claims. In 1979, largely in response to the Court's evolving analysis of these claims, the Legislature enacted N.J.S.A. 34:15-7.2. This statutory provision, which governs Workers' Compensation claims based on cardiovascular or cerebral vascular causes, requires that any individual seeking compensation under the statute must prove by a preponderance of the credible evidence that the injury or death was produced by the work effort or strain in excess of the wear and tear of the claimant's daily living. The statute was amended to prevent recovery from cardiac incidents that, as a matter of circumstance, happen to manifest themselves in the workplace. If personal factors may have contributed to the cause of death, the claimant must show that the work exposed him or her to greater risks than those in his or her daily life. (pp. 12-18)

2.	The Court's scope of review of factual findings by a judge of compensation is limited. However, interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference. This case turns on the interpretation of the elements defined by N.J.S.A. 34:15-7.2 for establishing a dependency claim on a decedent's cardiovascular death due to a cardiovascular cause. (p. 19)

3.	Here, plaintiff did not establish that his wife's death resulted from a work effort or strain involving a substantial condition or event. In discharging her work duties, Cathleen read, took telephone calls, sent and received e-mails, had conferences with her superiors and co-workers, and made decisions. These responsibilities did not require her to remain in a seated position for long, uninterrupted stretches of time. She was not confined to a specific space or instructed not to move from her workstation. She had control over her body position and movement while working, and was free to take breaks, during which she could stand, stretch, leave her workstation for a bathroom break or refreshments, or briefly exercise. At home, nothing prevented her from conducting conference calls while standing or reclining. (p. 19)

4.	Prolonged sitting, uninterrupted by breaks to stand, walk, or exercise, was not a condition compelled by Cathleen's job. The fact that her hours were long, or that the job was driven by deadlines, added to its challenge. However, Cathleen's periods of extended sitting while conducting her professional responsibilities at her home office did not constitute a work effort or strain involving a substantial condition, event, or happening to support a compensable cardiovascular claim. (p. 20)

The judgment of the Appellate Division is **REVERSED**.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, FERNANDEZ-VINA, and PATTERSON join in JUDGE RODRÍGUEZ's opinion. JUSTICE ALBIN and JUDGE CUFF (temporarily assigned) did not participate.**

JAMES P. RENNER,

    Petitioner-Respondent,

       v.

AT&T,

    Respondent-Appellant.

       Argued January 6, 2014 – Decided July 30, 2014

       On certification to the Superior Court,
       Appellate Division.

       Ivan R. Novich argued the cause for
       appellant (Littler Mendelson, attorneys).

       Patrick R. Caulfield argued the cause for
       respondent (Levinson Axelrod, attorneys).

    JUDGE RODRÍGUEZ (temporarily assigned) delivered the opinion of the court.

    In this appeal, we consider the statutory requirements for establishing a compensable claim for cardiovascular injury disease or death, as defined by N.J.S.A. 34:15-7.2 (section 7.2) of New Jersey's Workers' Compensation law.  Section 7.2 was enacted in 1979 as part of comprehensive reforms to the Workers' Compensation system.  In that amendment, the Legislature set higher standards of proof and causation for cardiovascular claims.

Here, we apply those standards to a petition filed by petitioner James Renner (James), who sought dependency benefits arising from the death of his wife, Cathleen Renner (Cathleen). Cathleen, an employee of defendant AT&T who worked primarily from a home office, died on September 25, 2007, as a result of a pulmonary thromboembolism. The Division of Workers' Compensation (Division) and the Appellate Division found that James had presented sufficient evidence to establish a compensable claim pursuant to section 7.2.

We reverse and hold that James has failed to demonstrate that Cathleen's death resulted from a "work effort or strain" within the meaning of N.J.S.A. 34:15-7.2, and has failed to present a compensable cardiovascular claim pursuant to the Workers' Compensation law.

I.

Cathleen died on September 25, 2007, as a result of a pulmonary thromboembolism while she was working at home in the course of her employment for AT&T. Her widower James initially filed a dependency claim petition in the Division. He alleged that Cathleen's death was compensable as an occupational disease as defined by N.J.S.A. 34:15-31. The judge of compensation awarded him dependency benefits.

The Appellate Division reversed, concluding that the judge had applied the incorrect standard to the facts presented, and

2

remanded to the Division to determine whether dependency benefits could be awarded pursuant to the cardiovascular injury, disease or death standard defined by N.J.S.A. 34:15-7.2.

On remand, based on the same evidence, the judge of compensation concluded that Cathleen's pulmonary thromboembolism was a vascular disease injury rather than an occupational disease injury and that the evidence was sufficient to prove a cardiovascular injury claim. The Appellate Division affirmed.

We granted AT&T's petition for certification. Renner v. AT&T, 209 N.J. 233 (2011). For the reasons that follow, we reverse the judgment of the Appellate Division.

## II.

### A.

The following evidence was presented by James at the original and remand hearings. At the time of her death, Cathleen had been employed by AT&T for about twenty-five years as a salaried manager. Her duties included formulating and executing contingency plans so that AT&T could operate as usual in the event of an anticipated job action by AT&T employees.

Cathleen had a telecommuting agreement with AT&T wherein she was allowed to work from a home office. She usually worked about three days a week from home and went into the office about twice a week. Although AT&T describes Cathleen's job as a "nine-to-five" position, her husband testified that she worked

3

at all hours from home and worked much more than forty hours per week -- at times until 2:00 a.m. Cathleen usually got up around 7:25 a.m. and would immediately begin working on her computer.

On the night before Cathleen's death, James was on a business trip and spoke with her on the telephone around 11:00 p.m. Cathleen told James that she was working on a project that was due the next day and that she would be working throughout the night if needed because the project had to be completed. Computer records show that she was still sending electronic communications regarding the project after midnight.

Robert Desiato, Cathleen's direct supervisor, testified about her work and his interactions with Cathleen in general and on the day she died. According to him, Cathleen's work was deadline driven, which required that Cathleen make sure that the projects were completed on time. Desiato also explained that the amount of work Cathleen had would have kept her busy and required her to be on the computer and telephone.

E-mail records confirm that Cathleen worked into the early morning hours of September 25, 2007, and throughout the morning later that day. Cathleen's computer records revealed that she had sent an e-mail with an attachment to a co-worker at 12:26 a.m., and then electronic communications at 9:10 a.m., 9:12 a.m., 9:55 a.m., 10:21 a.m., and 10:36 a.m. that morning. These

4

e-mails disclosed messages with various other individuals regarding the project.

Cathleen's son Jeffrey testified that his mother had started working in her home office when they got home from dinner on September 24, 2007. She was still working at her work station when he went to bed around 10:30 p.m. that night.

According to Jeffrey, Cathleen was working in her office when he woke up around 7:00 a.m. on the next day. At around 7:50 a.m., Cathleen took Jeffrey to catch his school bus around the corner. Cathleen grabbed her leg and said "ow" while walking out of the house.

At around 9:00 a.m., Cathleen told a co-worker that she was not feeling well, but she was going to complete the project. Cathleen completed the project and sent out an e-mail around 10:30 a.m. to her co-workers.

At 11:34 a.m., Cathleen called the Edison Township Emergency Medical Services (EMS). EMS workers responded to her house and found Cathleen lying prone in the vestibule screaming, "I can't breathe. Help me! I'm choking! Help me!" They began first-aid treatment and transported her to JFK Medical Center. Emergency resuscitative measures were unsuccessful, and she was pronounced dead after her arrival at the hospital. An autopsy revealed that Cathleen had died of a pulmonary thromboembolism that became lodged in the main trunk of her pulmonary artery.

Leon H. Waller, D.O., a board certified internal medicine physician by the American Board of Internal Medicine, testified in support of James's claim. He reviewed the EMS report, JFK admission record, autopsy report, and records from Cathleen's treating gynecologist (Somerset Piscataway OBGYN Group) prior to issuing his opinion.

Dr. Waller found that the work effort of sitting at her desk the day before and the day of her death contributed in a material degree to her deep vein thrombosis (DVT) and ultimate death. He opined that, within a reasonable degree of medical probability, the sedentary nature of Cathleen's work "was the precipitant in her getting a pulmonary embolism which resulted in her demise." Dr. Waller also opined that the pulmonary embolism was caused by DVT and that, based on the autopsy report, the clot had formed in Cathleen's leg between twelve to twenty-four hours before her death. He noticed that the clot was "a very big clot," coiled six centimeters long by three and a half centimeters wide by a half centimeter. He concluded such a large clot would have taken several hours to form. Dr. Waller explained the clotting process -- that for three to five days a clot will "organize," that is, it will grow and stay where it originates. Because there was no organization present, Dr. Waller concluded that the clot was fresh and did not originate in the lungs. He explained that because ninety to ninety-five

6

percent of clots originate in the deep veins of the leg, it is likely that Cathleen's clot originated there. Dr. Waller noted that one would not expect to find the clot in a lower extremity in the autopsy because it had traveled to its destination in the lungs.

According to Dr. Waller, Cathleen's other risk factors would not have played a large role in her death. Although Cathleen was obese, Dr. Waller said that this was only a minor risk factor. He testified that Cathleen's use of birth control pills was also a minor risk factor because she did not have a history of DVT or embolisms. He testified that Cathleen's enlarged heart would not have increased her risk of blood clots. Dr. Waller also noted that Cathleen was an active woman who often attended her children's sporting events and never sat and watched television.

Dr. Waller criticized the anticipated testimony from AT&T's expert by noting that AT&T's expert's pretrial report "doesn't address the autopsy findings or try to explain how an unorganized massive pulmonary embolism isn't related to the preceding several hours of inactivity."

William S. Kritzberg, M.D., a board certified internal medicine physician, testified for AT&T. He opined that Cathleen's pulmonary embolism was caused by a combination of risk factors: her morbid obesity; birth control pills; age; and

7

enlarged heart.  Moreover, Dr. Kritzberg stated that Cathleen's risk factors contributed to the formation of the clot more than her extended sitting for this project.  According to him, the autopsy report showed no evidence of a clot in the legs or DVT.  Dr. Kritzberg further noted that he did not believe it was possible to state within a reasonable degree of medical probability that Cathleen's cause of death was related to her work effort.

Dr. Kritzberg described Cathleen as "obviously sedentary" while working at home as well as during her time outside of work, driving her kids to their sports activities, and watching them play.  Based on that information, Dr. Kritzberg found it not possible to distinguish between Cathleen's activity level at work and outside of work.

B.

Following the remand hearing, the judge of compensation reconsidered the evidence against the standard set by N.J.S.A. 34:15-7.2.  The judge of compensation found that Cathleen's time spent at her computer caused a stasis in her blood flow, which caused the pulmonary embolism.  The judge of compensation found that both experts concluded that Cathleen's "work that evening and morning led to her death," but noted the differences in the weight to be given to her risk factors and lifestyle.  He found no reason to believe that either expert's opinion was

8

inconsistent with prevailing medical standards. He also found Cathleen's "daily life was active, as one might expect of a mother of three teen children." The judge of compensation accepted the conclusions of Dr. Waller, and found his testimonial hypothesis more probable. He also found that Cathleen "was under a high degree of stress at the time of her death" due to the project on which she was working. The judge of compensation found that Cathleen's death was a compensable event and entered an order awarding dependency benefits.

C.

AT&T appealed the compensation judge's decision and argued that (1) there was insufficient evidence to establish that Cathleen's work was in excess of the wear and tear of decedent's non-work activities; (2) the evidence was insufficient to establish that Cathleen's work caused the pulmonary embolism; and (3) the judge of compensation's findings were not supported by the evidence.

The Appellate Division affirmed, concluding that the claim was compensable pursuant to N.J.S.A. 34:15-7.2. The panel framed the dispositive question as follows: "whether Cathleen's lack of movement at work was more severe than her lack of movement in her daily living, and whether the inactivity at work caused her pulmonary embolism in a material way." The panel concluded that "credible evidence exists in the record to

9

support the judge of compensation's finding that her work inactivity was greater than her non-work activity." The panel also found that there was "sufficient credible evidence to support a logical inference that Cathleen worked throughout the night." The panel therefore determined that "Cathleen's work inactivity was 'in excess of the wear and tear' of her 'daily living.'" It also found substantial credible evidence to support the conclusion that "inactivity caused stasis of the blood resulting in the formation of a blood clot as opposed to one of Cathleen's other risk factors." The panel noted that Dr. Waller deduced that the clot's formation coincided with Cathleen's working hours and "Cathleen's prolonged inactivity while working caused her pulmonary embolism by a material degree."

## III.

AT&T argues that James failed to satisfy the burden of proof pursuant to N.J.S.A. 34:15-7.2, and therefore dependency benefits should be denied. AT&T argues that the courts erred in finding that Cathleen's sitting on September 24 and 25 substantially caused her death; that there is no evidence she died from DVT; that the judge of compensation and Appellate Division erred in holding that Cathleen's work effort was greater than the wear and tear of her daily living; that there was no "substantial condition, event or happening" involved with

10

Cathleen's work at the time of death; that Cathleen's sitting was not "work effort or strain;" and that sitting cannot have "substantially" caused her death considering her risk factors.

AT&T also argues that unless the decision is reversed, it will undermine 1) the Legislature's intent to contain costs for cardiovascular Workers' Compensation claims; 2) this Court's prior decisions requiring higher standards of proof and causation; and 3) the equitable allocation of when Workers' Compensation will ensue. AT&T argues the decisions below contradict this Court's prior decisions in Hellwig v. J.F. Rast & Co., 100 N.J. 37 (1988); Fiore v. Consol. Freightways, 140 N.J. 452 (1995). AT&T asserts this case will likely result in a significant increase in cardiovascular injury and death claims, which would counter the State's efforts to reduce insurance costs.

James argues that the dependency benefits awarded are "entirely proper and based on findings and conclusions altogether consistent with well-established workers' compensation case law." He asserts that the Appellate Division and judge of compensation applied the correct standard pursuant to N.J.S.A. 34:15-7.2 and that the decision was supported by sufficient evidence. James claims the extended duration of sitting was a substantial happening, "which in reasonable medical probability caused in a material degree the DVT,

11

pulmonary embolism, and [Cathleen's] death."  James argues that this decision is not inconsistent with Feltman, supra, 355 N.J. Super. at 36, which was a fact-specific determination.

IV.

Section 7.2 governs Workers' Compensation claims based on cardiovascular or cerebral vascular causes.  This section provides:

> In any claim for compensation for injury or death from cardiovascular or cerebral vascular causes, the claimant shall prove by a preponderance of the credible evidence that the injury or death was produced by the work effort or strain involving a substantial condition, event or happening in excess of the wear and tear of the claimant's daily living and in reasonable medical probability caused in a material degree the cardiovascular or cerebral vascular injury or death resulting therefrom.
>
> Material degree means an appreciable degree or a degree substantially greater than de minimis.
>
> [N.J.S.A. 34:15-7.2.]

Section 7.2 was enacted by the Legislature in 1979 as part of comprehensive reforms to the Workers' Compensation law. Mathesius v. Saint Barnabas Med. Ctr., 265 N.J. Super. 83, 89 (App. Div. 1993).  "Although the purpose of the reform was to permit more substantial awards to seriously injured workers, a number of the provisions were designed to contain compensation costs stemming from certain court decisions."  Ibid.

12

Specifically, section 7.2 was enacted as a cost-containment provision in response to a trilogy of cases that had set different standards for cardiovascular claims.

In Seiken v. Todd Dry Dock, Inc., 2 N.J. 469, 475 (1949), the Court set a stringent standard and recognized a "presumption that injury or death from heart disease is the result of natural physiological causes[.]"  In Ciuba v. Irvington Varnish & Insulator Co., 27 N.J. 127, 138 (1958), the Court overruled the Seiken decision and set a more moderate standard.  However, the Court in Ciuba reaffirmed its earlier holding in Seiken that "it is to be presumed that injury or death from heart disease is the result of natural physiological causes, and the onus is upon the claimant to prove by a preponderance of the evidence that the employment was a contributing cause of the injury or death." Ciuba, supra, 27 N.J. at 138.

In Dwyer v. Ford Motor Co., 36 N.J. 487 (1962), the Court created a permissive standard.  The Court eliminated the presumption accepted in Seiken and Ciuba.  Dwyer, supra, 36 N.J. at 506.  It held that a Workers' Compensation claimant "has the burden of showing by the preponderance of the believable evidence that the ordinary work effort or strain in reasonable probability contributed in some material degree to the precipitation, aggravation or acceleration of the existing heart disease and the death therefrom."  Dwyer, supra, 36 N.J. at 493.

13

The Legislature plainly expressed its intention to modify the holding in Dwyer by enacting section 7.2. It issued the following joint statement:

> This legislation would benefit employers by: (2) countering the far-reaching effects of Dwyer v. Ford in cardiac claims by requiring that a petitioner prove that the injury or death involved substantial effort or strain which was in excess of the rigors of the claimant's daily living and that the cause of the injury or death was job-related in a material degree.
>
> [S. Labor, Indus. and Professions Comm., Joint Statement to S. Comm. Substitute for S. No. 802 and Assemb. Comm. Substitute for Assemb. No. 840, 198th Leg., 2nd Sess., at 2 (Nov. 13, 1979).]

Indeed, we noted in Hellwig, supra, that we viewed "the [L]egislature's modification of the Dwyer criteria as an effort to require more reliable proof of the connection between work effort and cardiac dysfunction." 110 N.J. at 54; see also Gierman v. M & H Mach Co., 213 N.J. Super. 105, 108 (App. Div. 1986) (citing Perno v. Ornstein Fashions, Inc., 196 N.J. Super. 174, 176 (App. Div. 1984)).

In Hellwig, supra, decedent suffered a fatal myocardial infarction while working as a steamfitter. Hellwig, supra, 110 N.J. at 40. The judge of compensation found that the infarction was due to stress and strain at work, and awarded dependency benefits. Ibid. The Appellate Division affirmed.

14

*Hellwig* overruled the holding in *Dwyer* and held that "the statutory phrase 'in excess of the wear and tear of claimant's daily living' was intended to insure that the critical work effort was more strenuous than claimant's daily activities 'exclusive of work.'" *Ibid.* In so holding, we established the test for benefits and agreed with the Appellate Division that

> the Legislature intended no more than to require that the cardiovascular accident be caused by the work effort or strain involving a substantial condition in excess of the "wear and tear of the claimant's daily living" exclusive of work.
>
> [*Id.* at 42 (citing *Hellwig v. J.F. Rast & Co.*, 215 *N.J. Super.* at 251).]

We went on to observe that a claimant pursuing a cardiovascular claim

> has the burden of showing by the preponderance of the believable evidence that the ordinary work effort or strain in reasonable probability contributed in some material degree to the precipitation, aggravation or acceleration of the existing heart disease and the death therefrom. In this context, the significance of "some material degree" cannot be stated with mathematical precision. It means an appreciable degree; a degree greater than de minimis . . . .
>
> [*Hellwig*, *supra*, 110 *N.J.* at 47-49 (citations omitted).]

We observed that the Legislature changed the applicable test by enacting section 7.2, which mandates that the "work effort or strain [must be] in excess of the wear and tear of the

15

claimant's daily living." Id. at 48. As this Court noted, "[t]his language would appear to require proof that the strain of the work effort that allegedly precipitated the worker's disability or death from coronary disease was qualitatively more intense than the strain of the physical activity to which the worker was accustomed in his leisure time." Ibid. Therefore, the comparison of work effort to daily non-work activities requires a case-by-case fact-specific balancing. Ibid.

Section 7.2 also reinstated the presumption that coronary-artery disease and heart attacks are the result of natural causes. Fiore, supra, 140 N.J. at 467-68. The section was amended to "prevent recovery from cardiac incidents that as a matter of circumstance happen to manifest themselves in the workplace." Id. at 467. If personal factors may have contributed to the cause of death, the claimant "must show that his work exposed him to greater risks than those in his daily life." Id. at 477.

This Court also noted that

> [t]he specific requirement that the work effort or strain involve a "substantial condition, event or happening" does not mean that a worker's ordinary work effort is insufficient to establish causation. Rather, the statutory language is designed to focus attention on the intensity and duration of the precipitating work effort or strain in evaluating its capacity to cause cardiac dysfunction.

16

[See Hellwig, supra, 110 N.J. at 50.]

The Court went on to reject the premise that a claim is not compensable unless caused during a work effort that exceeds the claimant's ordinary work effort. Id. at 51. This Court accordingly held that

> an expert witness's conclusion in a heart compensation case that work effort "caused in a material degree the cardiovascular . . . injury or death" should be carefully evaluated in the context of both the statutory criteria and prevailing medical standards. As noted, the work effort should be measured against the "wear and tear of claimant's daily living," exclusive of work. The evaluation also should take into account the worker's medical history, the intensity and duration of the precipitating work effort, and the time interval between the work effort and the evidence of heart dysfunction. Compensation judges should be particularly skeptical of expert testimony that supports or contests a finding of causation on the basis of reasoning inconsistent with prevailing medical standards.

> [Id. at 54.]

The Appellate Division had the opportunity to apply the Hellwig standard in Feltman, supra, 355 N.J. Super. at 39, a case similar to this one. The case involved a vice president of a company who died from a myocardial infarction at home an hour after returning from a business trip for an important contract. Id. at 39. Although there was no autopsy, both experts opined that myocardial infarction was a probable cause of death. Id.

17

at 42-43.  However, one expert opined it could also be a pulmonary embolism from DVT.  Id. at 43.  Decedent Feltman was sixty-three years old, morbidly obese, and had a history of high blood pressure, which he took no steps to correct.  Id. at 52-53.  He was a "couch potato" who spent most of his leisure time watching television or on the computer.  Id. at 42.

The judge of compensation concluded that the heart attack was the result of the natural progression of Feltman's coronary artery disease and that the stress from the work trip was not a substantial event because "(1) Feltman handled stress well, as evidenced by his ability to relax in California after the day-long meetings; (2) Feltman's symptoms of discomfort first manifested themselves several weeks before his trip; and (3) he did not complain of any cardiac symptoms during his business trip."  Id. at 52.

These cases illustrate the fundamental distinction that the Legislature intended to draw when it amended the Act to add section 7.2.  To sustain a Workers' Compensation petition premised upon cardiovascular injury, a claimant must demonstrate that the harm was caused by a work effort or strain involving a substantial condition that exceeds "the wear and tear of the claimant's daily living" outside of the claimant's work responsibilities.  Hellwig, supra, 110 N.J. at 42; see also N.J.S.A. 34:15-7.2.  That statutory standard governs this case.

18

V.

Our analysis begins by noting that the scope of appellate review of factual findings by a judge of compensation is limited. Close v. Kordulak Bros., 44 N.J. 589, 599 (1965). However, "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). This case turns on an issue of law, namely, the interpretation of the elements defined by section 7.2 for establishing a dependency claim on a decedent's cardiovascular death due to a cardiovascular cause.

Based on this record, we conclude that there has been no showing that Cathleen's death resulted from a work effort or strain involving a substantial condition or event. According to the undisputed testimony, Cathleen's death resulted from a pulmonary thromboembolism. Dr. Waller opined that the thromboembolism was caused by stress and prolonged sitting.

Cathleen was an employee who performed her job at a workstation either at AT&T's office or her home. Her "work effort" was performed while sitting at a desk, using a telephone or a computer. In discharging her work duties she read, took telephone calls, sent and received e-mails, had conferences with her superiors and co-workers and made decisions. Unlike certain other occupations in which prolonged confinement in a cramped

19

space is a job requirement, Cathleen's responsibilities did not require her to remain in a seated position for long, uninterrupted stretches of time.  She was not confined to a specific space or instructed not to move from her workstation.  Moreover, at both her home and employer workstations, Cathleen had control over her body position and movement while working.  She was free to take breaks, during which she could stand, stretch, leave her workstation for a bathroom break or refreshments, or briefly exercise.  At home, nothing prevented Cathleen from conducting conference calls while standing or reclining.

In short, Cathleen was free to move around at will during her work hours.  Prolonged sitting, uninterrupted by breaks to stand, walk or exercise, was not a condition compelled by her job.  The fact that Cathleen's hours were long, or that the job was "deadline-driven," undoubtedly added to the challenge of her job.  However, the fact that Cathleen sat for long periods of time in one position is not, under the facts presented, a component of her work effort or strain, as section 7.2 requires.

Thus, we conclude that Cathleen's extended sitting while conducting her professional responsibilities at her home office does not constitute a "work effort or strain involving a substantial condition, event or happening" to support a compensable cardiovascular claim.

## VI.

Therefore, the judgment of the Appellate Division is reversed.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, FERNANDEZ-VINA, and PATTERSON join in JUDGE RODRÍGUEZ's opinion. JUSTICE ALBIN and JUDGE CUFF (temporarily assigned) did not participate.

SUPREME COURT OF NEW JERSEY

NO.    A-71                          SEPTEMBER TERM 2011

ON CERTIFICATION TO      Appellate Division, Superior Court


JAMES P. RENNER,

      Petitioner-Respondent,

          v.

AT&T,

      Respondent-Appellant.


DECIDED            July 30, 2014
            Chief Justice Rabner            PRESIDING

OPINION BY            Judge Rodríguez

CONCURRING/DISSENTING OPINIONS BY

DISSENTING OPINION BY


| CHECKLIST | REVERSE | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | ---------------------- | ------------------- |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | ---------------------- | ------------------ |
| TOTALS | 5 | |